Opinion filed February 16, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* NICHOLAS L., Alleged to be a Person Subject to Involuntary Administration of Psychotropic Medication | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | No. 09—MH—151 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Nicholas L., Respondent-Appellant). | ) ) ) ) | Honorable Bonnie M. Wheaton, Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Burke and Schostok concurred in the judgment and opinion.

**OPINION**

Respondent, Nicholas L., appeals from an order of the circuit court of Du Page County granting the State's petition for involuntary administration of psychotropic medication pursuant to section 2—107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2—107.1 (West 2008)). For the following reasons, we reverse.

BACKGROUND

On August 26, 2009, respondent was voluntarily admitted to Elmhurst Memorial Hospital (Elmhurst) in Elmhurst, Illinois.[1] On September 2, 2009, the State filed a petition seeking

_____

[1]The record contains a "Notice of Change of Status" dated September 28, 2009 (filed October 2, 2009), indicating that on September 14, 2009, the court found respondent to be a person subject to involuntary admission and that respondent was transferred to Westshire Nursing Facility in Cicero,

authorization to administer electroconvulsive therapy (ECT) to respondent pursuant to section 2—107.1 of the Code. The State subsequently filed an amended petition on September 11, 2009, adding a request for authorization to administer psychotropic medication. The trial court conducted an evidentiary hearing on the State's petition on September 14, 2009.

Lori Sims, a senior clinician consultant at the Du Page County health department, testified that respondent was in his early twenties and had a history of mental illness since his teens. For almost one year, respondent was a client of the department's "assertive community treatment team" (ACTT), its most intensive treatment team. ACTT assisted clients who had difficulty engaging in other forms of treatment and in following through with treatment recommendations. Respondent had been hospitalized three or four times since he was referred to ACTT. ACTT attempted to visit respondent at his home twice a week. Sims testified that respondent did not like the meetings and sometimes failed to be present for them. A doctor from the health department prescribed psychotropic medication for respondent, which was provided in "weekly pill packs." Respondent took the medication either on his own or with the help of his mother. Respondent did not want ACTT to monitor his medication; he "wanted to be in charge of his own medications."

Sims stated that respondent had been taking his medication but recently stopped. When Sims attempted to discuss with respondent the circumstances leading to his hospitalization, respondent told her that he was not manic and did not want to talk about his condition; he wanted to talk only about his discharge plans. Sims believed that respondent needed psychotropic medication because, when he was taking it, he was stable and attended school. Respondent had lived with his mother but

Illinois.

recently moved into his own apartment. Respondent was brought to Central Du Page Hospital after living in his own apartment for about one week.

Respondent stipulated to the expert status of Dr. Timothy Cullinane, his psychiatrist since August 26, 2009. Dr. Cullinane testified that respondent had suffered from mental illness since his teens. Since respondent's admission to Elmhurst three weeks prior to the hearing, Dr. Cullinane met with him 13 or 14 times. Dr. Cullinane opined that respondent suffered from "[b]ipolar disorder currently in the manic phase with psychotic features." He explained that bipolar disorder was generally characterized by periods of depression, periods of normal mood, and periods of mania. Respondent's illness included a thought disorder, which meant that respondent was not thinking "logically and clearly" when he was first admitted to the hospital, and his mood was "mainly irritable."

Dr. Cullinane testified about the events leading to respondent's hospitalization. As respondent was being transported by ambulance from Central Du Page Hospital to Elmhurst, he fled the ambulance while it was stopped at a red light. A missing persons report was filed and Chicago police found respondent wandering on the city's west side.[2] After examining respondent, Dr. Cullinane told respondent that he thought respondent should take psychotropic medication. Respondent initially did not want to take the medication, because he did not think it was necessary.

Dr. Cullinane testified that respondent exhibited a deterioration in his ability to function, because, due to his episodic irritable mood and thought disorder, when he came to the hospital he was no longer able to live in the community, get along with others, or maintain daily living activities.

---

[2]Respondent's counsel objected to this line of questioning for anything beyond forming the basis of Dr. Cullinane's opinion. The trial court agreed that the testimony was limited to that purpose.

Respondent also exhibited threatening behavior; he once told a nurse at the hospital that he was going to put a fork in her head. Due to respondent's agitation and manic behavior, psychotropic medications were administered to respondent "prn" (as needed).

On direct examination, Dr. Cullinane testified as follows regarding respondent's capacity to make a reasoned decision about treatment:

"Q. Do you believe that [respondent] has the ability to make an appropriate medical decisions [*sic*] at this time?

A. He appears to, but his history is that once he gets out of the hospital he often does not take his medication for a period of time and, therefore, becomes ill again which has led to his long history and need for involvement with ACT team which is not—does not get involved with patients who are stable and taking their medicine every day.

* * *

Q. In your opinion, does [respondent] have the capacity at this time to make a reasoned decision about whether the treatment you are proposing is appropriate?

A. I believe so because he is taking the medication I am prescribing at this time.

Q. So you think he does have the capacity to decide whether or not the medications you're prescribing and the ECT are appropriate?

A. Again, he is taking the oral medications I'm prescribing right now. I'm concerned about what will happen after he leaves the hospital."

Dr. Cullinane testified that respondent had been advised in writing of the risks and benefits of the two psychotropic medications requested in the petition and of ECT. Dr. Cullinane discussed the medications and ECT with respondent. Dr. Cullinane thought that respondent was "more

interested in taking medication than having ECT treatments." Dr. Cullinane requested to withdraw the ECT request from the petition, explaining:

"At the time we initially filed the petition, [respondent] had received multiple prn medications of different types in large amounts and did not seem to be getting better at all. However, subsequently, he seemed to get better and need fewer and fewer prn medications and even though at that time he was not taking any oral medicines, he continued to improve. So I thought that that would be a better choice for him since he didn't particularly want the ECT."

The court accepted the withdrawal of the ECT request from the petition. After ascertaining that respondent still objected to treatment with psychotropic medications, even without the ECT, the court indicated that the hearing would proceed on the two requested medications.

Dr. Cullinane testified that he sought permission to administer Risperdal Consta, 50 milligrams, intramuscularly, every two weeks. The expected benefits were a "more complete resolution of symptoms and a longer-term resolution of symptoms because the medicine lasts for two weeks." Dr. Cullinane said that respondent was currently taking Invega (orally), which is the "active part of Risperdal." While taking Invega, respondent was improving and becoming more stable. Dr. Cullinane explained that the reason for requesting Risperdal Consta instead of continuing to use Invega was that the hospital did not have access to an injectable form of Invega and the injectable Risperdal Consta lasts for about two weeks. According to Dr. Cullinane, with Risperdal Consta, "there would be less of a chance that [respondent] would forget to take his medicine or an [*sic*] impulse to decide not to take it and then become ill again and repeat the cycle of becoming ill and rehospitalization, et cetera." Dr. Cullinane explained that the "same therapeutic effect could be

achieved with Invega, but there's the issue of medication adherence. And if, again, he were to choose to not take the medication, of course, it wouldn't work. But if you had the Risperdal Consta, it would work for two weeks." Potential side effects of Risperdal Consta were the same as those for Invega and respondent was not reporting any side effects from the Invega. Both Risperdal Consta and Invega had the long-term risk of tardive dyskinesia—involuntary muscle movements of the hand or face—that could be permanent. This effect could be avoided by reducing or withdrawing the medicine if such signs were present. Dr. Cullinane opined that the benefits of Risperdal Consta outweighed the potential harm.

Dr. Cullinane testified that he also sought authorization to administer Haldol Decanoate, 100 milligrams, intramuscularly, every 2 weeks for a total of 3 doses, in conjunction with the Risperdal Consta. In addition to being long-acting, Haldol Decanoate is rapid-acting and would keep respondent stable for six weeks until the Risperdal Consta started working. The expected benefits and potential side effects of Haldol Decanoate were the same as those for Risperdal Consta. Respondent had received the Haldol Decanoate "prn" at the hospital. Although he did not respond immediately to the medication, he got better over time and experienced no adverse effects. Dr. Cullinane testified that Haldol Decanoate was available in oral form, but he was concerned that respondent would stop taking it once he left the hospital.

Dr. Cullinane noted that respondent was in the hospital voluntarily, and he anticipated that respondent could be discharged after receiving the three injections of Haldol Decanoate and the initial injection of Risperdal Consta. He opined that, without the requested medications, respondent's prognosis was "poor." Dr. Cullinane stated, "I think he would become ill again and not be able to

take care of himself; perhaps use poor judgement and end up in a crime-ridden neighborhood somewhere and possibly get hurt or worse."

During respondent's cross-examination of Dr. Cullinane, the following colloquy ensued:

"Q. Dr. Cullinane, notwithstanding your thoughts about whether or not [respondent] will take the medication once he is released, today do you believe he has the capacity to make a reasoned decision about treatment?

A. Yes. He is taking his medications right now.

Q. And that's Invega?

A. Yes.

Q. Do you know if he was taking Invega before he was hospitalized this last time?

A. I'm not sure what medications he was taking in the past.

Q. How long has he been compliant with taking the Invega since he's been here?

A. I would have to check the computer, but it's been almost a week I believe.

Q. In your discussions with [respondent], has he expressed what his future intent is in regards to taking medication, if he's going to stop it once he is released—or what has he said about that?

A. He has said he wants to take it in the future.

Q. And you said that you have seen progress since he's taken the Invega?

A. Yes.

Q. Do you believe that [respondent] sees that he has a need to stay on the medication now?

A. He says that, but unfortunately, [respondent] has had many experiences in hospitals, so it's always hard for me to know whether somebody is being truthful about his [*sic*] or just saying something to try to get me to discharge them from the hospital. So I can't say 100 percent for sure. I can only say that future human behavior is best predicted by past behavior, and he has stopped his medicine at times in the past."

On redirect examination, Dr. Cullinane opined that before respondent was hospitalized he did not have the capacity to make a reasoned decision about his treatment. Respondent gained capacity by taking Invega and the many doses of antipsychotic medications administered "prn." Dr. Cullinane reiterated that he did not know if he could believe respondent when he said that he knew he needed to continue the medications to treat his mental illness.

The court then questioned Dr. Cullinane about respondent's capacity:

"Q. Does he have the capacity to make a reasoned decision about this particular medication in this form of delivery at this dosage?

A. The oral or the injectable?

Q. Right.

A. The injectable?

Q. Yes, the injectable.

A. Yes."

The State next called respondent who explained his objection to taking Risperdal Consta in the following colloquy:

"Q. So what objection do you have to—so you don't have an objection to Risperdal Consta?

A. I do object.

Q. And why is that?

A. It's too much.

Q. Too much what? It's too much of what?

A. Medication.

Q. Too high of a dosage you mean?

A. Correct, and they don't offer a dose low enough.

Q. So you've had Risperdal Consta in the past?

A. No. It has been offered.

Q. But you've never had it?

A. Correct. Too high of a dosage of Risperdol [*sic*][.] I've choked on my tongue and paramedics needed to be called.

Q. And that's when it was given to you orally in a pill form?

A. (Unintelligible). I did not make that statement.

THE COURT: I'm sorry. I can't hear you.

Q. That's when the Risperdal was given to you in a—as a pill, not as a shot?

A. Right.

Q. Have you ever had Risperdal as a shot?

A. No, and I do not wish to try a shot.

Q. And why is that?

A. I am reliable enough to call my counselors to demand my medication be delivered when it is not at my house and I run out[,] enough to know that I do not need a shot to remind me. I complain about the delivery of my medication. Ask my mother.

Q. By delivery you mean like through the—how it gets to your house?

A. Right. I—the only reason I run out and do not take my medication and go off balance is because my medication is not delivered on time and I call to complain that it isn't there for me. Call witnesses."

On cross-examination, respondent testified that he was currently taking Invega voluntarily. He said that Dr. Cullinane explained that Invega was the "more modern" version of Risperdal—in the same family of drugs and made by the same manufacturer. Although it had not been brought to respondent's attention that Dr. Cullinane wanted to involuntarily administer Risperdal Consta, respondent understood the purpose of the hearing and did not want to take Risperdal Consta. Respondent explained that he had "balanced this medication. It's physically and mentally dangerous to change medications."

The State then recalled Dr. Cullinane, and the following colloquy took place:

"Q. Dr. Cullinane, after hearing [respondent] testify do you still believe—regarding the Risperdal Consta, do you believe that he—do you still believe that he has the capacity to make a reasoned decision regarding the administration of Risperdal Consta?

A. I believe that based on the fact that he has been off his medicine intermittently in the past and it has resulted in him becoming more ill, that this Risperdal Consta would be much more likely to keep him stable for a much longer period of time. And I think [respondent] is minimizing the problems of being off medication and how difficult staying on his medication is for him.

Q. So is he—by refusing to submit to the Risperdal Consta, is he making a reasoned decision by doing that?

A. No."

On cross-examination, Dr. Cullinane testified as follows:

"Q. Just for clarification, Dr. Cullinane, based on what [respondent] said, you still believe he has the capacity to make a reasoned decision about this particular medication in this particular form, just that he doesn't agree with it; would you agree with that?

A. Again, that's a very challenging question that you're both asking. And my statement is based on my judgment that since this is a life-long illness and [respondent] has had many years of experience with it, and if he was taking his oral medication regularly, none of us would be here, nobody would be in the hospital talking about his condition and his treatment, that at this point in his life the best choice from a medical point of view would be to take the medication in a form that was in his body on a regular basis every day rather than have to make that choice every single day[:] do I need to take my medicine, do I not, or do I need to call to have it delivered or do I wait until it gets delivered or what.

Q. Right. Doctor, I understand what your position is on it, but I'm asking you about whether or not you think [respondent] has the capacity to make this decision himself in regards to this medication?

A. Again, my judgment is based on what I think a reasonable person would want for themselves for their own treatment; that most people would want to stay well and stay out of the hospital and function at the highest level possible. Therefore, if one method or type of treatment didn't work and something else offered a greater likelihood of working, I think a reasonable person would choose that type of treatment. And as [respondent] said, he's never been on Risperdol [*sic*] Consta to see if that does provide superior treatment for him. So refusing it without having a good logical basis to do so seems to me a poor choice.

Q. He's taking the Invega medication voluntarily right now?

A. Yes.

Q. And from what it appears to me to be the reason that you want him on the Risperdol [*sic*] Consta is because you don't believe he will continue on the Invega, correct?

A. Essentially, yes."

The State then rested and respondent rested without calling any witnesses. The trial court stated:

"Okay. Although Dr. Cullinane's testimony at first was a little equivocal I guess, I think his last statement is indicative that [respondent] at this point is not capable of making a reasoned decision about the administration of this particular medication, so I will make a finding that having a mental illness—because of this mental illness, he—[respondent], has shown a deterioration in his ability to function marked by episodic occurrences and that the benefits of the medication prescribed would outweigh any harm, and that [respondent] at this point makes—lacks the capacity to make a reasoned decision about this particular medication in this form of delivery and that this is the least restrictive alternative."

The court granted the State's petition.

Respondent subsequently filed a motion for a new trial and then an amended motion, which the trial court denied. Respondent timely appealed.

ANALYSIS

Respondent argues that, because the State provided no evidence that he was given written notification of alternative treatments (405 ILCS 5/2—102(a—5) (West 2008)), the State failed to prove that he lacked the capacity to make a reasoned decision about his treatment and that the

evidence did not support the trial court's order. Before addressing respondent's contention, we first consider the State's argument that the appeal is moot.

An appeal is moot when no actual controversy is presented or when the issues raised in the trial court have ceased to exist, rendering it impossible for the court of review to grant effectual relief to the appellant. *In re Gloria C.*, 401 Ill. App. 3d 271, 275 (2010). The issue of mootness and the applicability of exceptions to the mootness doctrine are reviewed *de novo*. *In re Alfred H.H.*, 233 Ill. 2d 345, 350-51 (2009). Here, because the trial court's order expired by its own terms 90 days from its entry on September 14, 2009, this appeal is moot. See *In re Suzette D.*, 388 Ill. App. 3d 978, 982 (2009) (concluding that appeal from the trial court's order authorizing the administration of psychotropic medication was moot because the 90-day term of the order had expired).

Respondent argues that we should nonetheless reach the merits of his appeal under the public-interest exception to the mootness doctrine. We agree. Our supreme court has stated:

"The public interest exception allows a court to consider an otherwise moot case when (1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *Alfred H.H.*, 233 Ill. 2d at 355.

The exception is narrowly construed and applies only where a clear showing is made of each criterion. *Alfred H.H.*, 233 Ill. 2d at 355-56. Routine sufficiency-of-the-evidence challenges do not implicate issues of a public nature. *Alfred H.H.*, 233 Ill. 2d at 356. However, questions about compliance with the Code's procedures " 'involve matters of "substantial public concern." ' " *In re Laura H.*, 404 Ill. App. 3d 286, 289 (2010), quoting *In re Robert S.*, 213 Ill. 2d 30, 46 (2004) (quoting *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002)).

Here, the question presented by respondent involves the issue of statutory compliance and thus qualifies as a matter of a public nature. Moreover, the vast number of cases addressing the issue of compliance with section 2—102(a—5) (see, *e.g.*, *In re Alaka W.*, 379 Ill. App. 3d 251, 263-64 (2008); *In re Dorothy J.N.*, 373 Ill. App. 3d 332, 336-37 (2007)) indicates both a need for an authoritative determination for the future guidance of public officers and the likelihood of future recurrence. See *Laura H.*, 404 Ill. App. 3d at 289. We also confirm respondent's assertion that no published opinion in our state has addressed the specific issue of failure to provide written notification solely of alternative treatment options. Accordingly, the public-interest exception is applicable to respondent's contention regarding statutory compliance.

We now turn to the merits of respondent's appeal. Respondent maintains that, because the State provided no evidence that he was given written notification of alternative treatments, the State failed to prove that he lacked the capacity to make a reasoned decision about his treatment. The State responds that, even though there was no evidence that respondent received written notification about alternative treatments, respondent had actual knowledge about the alternative treatments of Invega and the Haldol he had received "prn." We agree with respondent.

Section 2—102(a—5) of the Code provides in part:

"If the services include the administration of electroconvulsive therapy or psychotropic medication, the physician or the physician's designee shall advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated." 405 ILCS 5/2—102(a—5) (West 2008).

Here, the State concedes that respondent was not provided written notification of alternatives to the proposed treatment. The question thus becomes whether this omission compels reversal. We hold that it does.

"Whether substantial compliance with a statutory provision has taken place presents a question of law, which we review *de novo*." *Laura H.*, 404 Ill. App. 3d at 290. The State is required to present clear and convincing evidence of compliance with section 2—102(a—5). *Laura H.*, 404 Ill. App. 3d at 290 (citing *In re Louis S.*, 361 Ill. App. 3d 774, 779-80 (2005)). The rationale underlying the requirements of section 2—102(a—5) is to not only ensure that a respondent is fully informed, but also "to ensure that a respondent's due process rights are met and protected." *In re John R.*, 339 Ill. App. 3d 778, 784 (2003). Strict compliance is necessary to guard a respondent's fundamental liberty interest in refusing invasive medication. *In re James S.*, 388 Ill. App. 3d 1102, 1106-07 (2009). Verbal notification is insufficient and the right to receive written notification under section 2—102(a—5) cannot be waived by a respondent. *John R.*, 339 Ill. App. 3d at 783-84. Neither is the right to written notification subject to harmless-error analysis. *In re A.W.*, 381 Ill. App. 3d 950, 957 (2008).

Here, Dr. Cullinane testified that respondent received written notification of the risks and benefits of both psychotropic medications requested in the petition. However, there was no evidence that respondent was advised in writing of alternative treatments as required by section 2—102(a—5). Absent such evidence, section 2—102(a—5) of the Code was violated and the trial court's order must be reversed. See *Laura H.*, 404 Ill. App. 3d at 292 (concluding that the respondent was not provided written notification of the benefits and treatment alternatives and holding that it "remains imperative to conduct the proceedings and the administration of such medication pursuant to the

requirements of *** the Code"); *John R.*, 339 Ill. App. 3d at 783 ("If the patient is not informed of the risks and benefits of the proposed medication, an order for the involuntary administration of medication must be reversed because the respondent has not been provided with the necessary information from which he could make a reasoned decision.").

The State argues that reversal is not required because (1) respondent cites no authority in support of that proposition; (2) respondent was aware of the alternatives because he was taking Invega at the time of the hearing; and (3) respondent is required to show that he suffered prejudice as a result of the lack of statutory compliance.

Although it is true that no case directly addresses the required written notification of alternative treatments alone, we can conceive of no ground for departing from the reasoning in the cases cited by respondent and in the recent case we cited above, *Laura H.* We also observe that, although not addressed by the parties, the record contains no evidence that respondent received written notification of the side effects of the proposed medications.

In *John R.*, a case consolidating three appeals, one respondent was given written notice of the risks, benefits, and side effects of only one of the medications listed in the petition. The other two respondents received no written notification. *John R.*, 339 Ill. App. 3d at 784. The court held that the failure to provide written notice compelled reversal because the "Code's procedural safeguards are not mere technicalities but essential tools to safeguard [a respondent's] liberty interests." *John R.*, 339 Ill. App. 3d at 785. In *A.W.*, the court held that the trial court's order granting the State's petition was against the manifest weight of the evidence because of the lack of evidence of written notification of the risks, benefits, and alternatives of the proposed medications. *A.W.*, 381 Ill. App. 3d at 957. In *Louis S.*, the court reversed because, *inter alia*, the State failed to provide written

notification to the respondent of the risks and benefits. *Louis S.*, 361 Ill. App. 3d at 780. In *Laura H.*, the court reversed the trial court's order both for lack of statutory compliance and as against the manifest weight of the evidence where the documents the respondent received listed the medications' side effects but did not address the risks, benefits, or alternatives. *Laura H.*, 404 Ill. App. 3d at 290-91, 292. The court particularly commented that the information provided was just a stack of drug handouts and did not explain treatment alternatives, which could be medical or nonmedical. *Laura H.*, 404 Ill. App. 3d at 291-92. Although none of these cases reversed solely for the failure to provide written notification of alternative treatment options, the law is clear that failure to strictly comply with the Code's written notification requirements in general compels reversal. Accordingly, we hold that failure to provide written notification of alternative treatment options compels reversal.

The State's argument that respondent's actual knowledge about the medications he was taking or had taken precludes reversal is similarly unavailing. Respondent's knowledge of treatment alternatives is insufficient. See *John R.*, 339 Ill. App. 3d at 784 (Code's procedural safeguards are designed not to ensure a respondent's understanding, but rather to protect his or her due process rights). Moreover, that respondent was aware of certain alternative medications does not address other medical options or any nonmedical treatment alternatives. See *Laura H.*, 404 Ill. App. 3d at 292 (noting that, under the Code, available alternatives could be medical or nonmedical).

We are also unpersuaded by the State's contention that respondent bore the burden of proving prejudice. In support of this proposition, the State cites *Louis S.* The court there concluded that the respondent was prejudiced by the State's failure to comply with the three-day notice-of-hearing requirement under section 2—107.1(a—5)(1) of the Code. *Louis S.*, 361 Ill. App. 3d at 778. In reaching this conclusion, the court cited *In re C.E.*, 161 Ill. 2d 200 (1994), for the proposition that

the "respondent must establish he was prejudiced by the absence of formal notice." *Louis S.*, 361 Ill. App. 3d at 778. As notice of the hearing is not at issue here, *Louis S.* is distinguishable. Neither do we read the case so broadly to support the State's proposition, because the written notification procedures at issue here function to ensure that a respondent has the information necessary to make a reasoned decision. See *Louis S.*, 361 Ill. App. 3d at 780. In light of this function and courts' refusals to apply a harmless-error analysis in such cases (as even the State acknowledges), we cannot say that respondent bore the burden of establishing prejudice. Nor does our research reveal any case law requiring a showing of prejudice from lack of compliance with the written notification requirements of section 2—102(a—5).

Although our holding with respect to respondent's first argument on the lack of written notification is dispositive, we nonetheless address respondent's companion argument that the trial court's finding that he lacked the capacity to make a reasoned decision was against the manifest weight of the evidence. As noted, routine sufficiency-of-the-evidence challenges do not implicate issues of a public nature. *Alfred H.H.*, 233 Ill. 2d at 356. However, the collateral-consequences exception to the mootness doctrine applies in mental health cases. *Alfred H.H.*, 233 Ill. 2d at 361-62. Where, as here, the involuntary treatment order at issue is the respondent's first, collateral consequences could plague him in the future.[3] See *In re Val Q.*, 396 Ill. App. 3d 155, 159 (2009).

---

[3]At oral argument, respondent's attorney informed this court that respondent appealed from the trial court's September 14, 2009, order finding him to be a person subject to involuntary admission. That appeal was heard by the Fifth District. According to respondent's attorney, the State confessed error in that case and the trial court's involuntary admission order was to be vacated. Thus, the involuntary treatment order at issue here is the only such order involving respondent.

Because the evidence shows that respondent has a long-term need for psychotropic medication, he is likely to be subject to future proceedings and the involuntary treatment order at issue here could adversely affect him at that time. See *Val Q.*, 396 Ill. App. 3d at 160. Thus, we apply the collateral-consequences exception.

Respondent specifically contends that the State failed to prove by clear and convincing evidence that he lacked the capacity to make a reasoned decision, because the evidence actually showed that respondent possessed the capacity or, at the very least, did not establish that he lacked capacity. The State responds that Dr. Cullinane's testimony was sufficient because it was an expert opinion supported by the evidence. We agree with respondent.

Section 2—107.1(a—5)(4)(E) of the Code requires that the State prove by clear and convincing evidence that the respondent lacks the capacity to make a reasoned decision about the treatment. "Clear and convincing evidence is defined as the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the veracity of the proposition in question." *Suzette D.*, 388 Ill. App. 3d at 984-85. The clear-and-convincing-evidence burden is higher than a preponderance of the evidence, but falls short of the reasonable doubt standard applied in criminal proceedings. *In re Lisa P.*, 381 Ill. App. 3d 1087, 1092 (2008). "An individual has the capacity to make treatment decisions for himself when, based upon conveyed information concerning the risks and benefits of the proposed treatment and reasonable alternatives to treatment, he makes a rational choice to either accept or refuse the treatment." *In re Israel*, 278 Ill. App. 3d 24, 36 (1996). We review the trial court's findings under the manifest-weight-of-the-evidence standard. *Suzette D.*, 388 Ill. App. 3d at 985. We will not reverse the trial court unless "the opposite conclusion is apparent"

or its findings are "unreasonable, arbitrary, or not based on the evidence." *Lisa P.*, 381 Ill. App. 3d at 1092.

We first note that, based on the State's failure to provide evidence establishing that respondent was provided written notification of alternative treatment options, the trial court's order was against the manifest weight of the evidence. See *Laura H.*, 404 Ill. App. 3d at 291 (lack of compliance with section 2—102(a—5) rendered the trial court's order against the manifest weight of the evidence).

However, even aside from the failure to provide written notification, the trial court's order was against the manifest weight of the evidence. Our review of the record indicates that Dr. Cullinane's testimony was equivocal at best. The trial court, in making its finding that respondent lacked the capacity to make a reasoned decision, did not mention the clear-and-convincing-evidence standard. We hold that the trial court's finding was against the manifest weight of the evidence.

On direct examination, Dr. Cullinane was asked three times whether he thought respondent had the capacity. Dr. Cullinane responded, "He appears to"; "I believe so"; and "Again, he is taking the oral medications ***. I'm concerned about what will happen after he leaves the hospital." As the trial court observed, this testimony was somewhat equivocal.

However, during cross- and redirect examinations, Dr. Cullinane testified that respondent had the capacity to make a reasoned decision. On cross-examination, when asked whether he believed respondent had the capacity, Dr. Cullinane replied, "Yes. He is taking his medications right now." On redirect examination, Dr. Cullinane opined that respondent lacked the capacity before his hospitalization, but gained the capacity from taking Invega and the antipsychotic medications "prn." When questioned by the court whether respondent had the capacity to make a reasoned decision

about the particular medication in the particular delivery form in the particular dose, Dr. Cullinane answered "Yes." Although qualified by his opinion as to why respondent had the capacity, Dr. Cullinane's testimony was that respondent had the capacity. Moreover, Dr. Cullinane's opinion that respondent would stop taking his medicine upon discharge from the hospital, and therefore lose his capacity to make a reasoned decision, did not alter his opinion that respondent currently had the capacity.

When he was recalled by the State, Dr. Cullinane testified that respondent was minimizing his difficulty in staying on medication and the problems he experienced when he was off of the medication. He further stated that a "reasonable person" would want to stay well and would choose the treatment with the greatest likelihood of success. Dr. Cullinane testified that he thought that respondent's refusal was a "poor choice." In essence, Dr. Cullinane's testimony was that he disagreed with respondent's choice. However, that respondent disagreed with his psychiatrist is not indicative of a lack of capacity to make a reasoned decision. See *Robert S.*, 213 Ill. 2d at 53 (noting the testifying psychiatrist's "simplistic assessment" that the respondent lacked the capacity because he refused to do what the psychiatrist recommended). Accordingly, the trial court's finding was against the manifest weight of the evidence.

Respondent's testimony also rendered the trial court's finding that he lacked capacity contrary to the manifest weight of the evidence. Respondent testified that he objected to the proposed injectable medication because the dose was too high; paramedics had to be called when he choked on his tongue from too high a dose of Risperdal in the past; and he did not see the need for injectable medication because he was reliable enough to call his counselors when there was a problem with timely delivery of his medication. Moreover, respondent was aware of his mental illness and decided

to treat it by taking oral medication. He understood that Invega was in the same family of drugs as Risperdal Consta. Respondent also understood Dr. Cullinane's concern about his not taking the oral medication in the future. He explained that he had balanced his medication and believed it was dangerous to change medications. It was undisputed that the oral Invega was working; indeed, Dr. Cullinane testified that the therapeutic effect of the proposed medications could be achieved with Invega. Given respondent's testimony, the trial court's finding that he lacked the capacity was contrary to the manifest weight of the evidence. See *Israel*, 278 Ill. App. 3d at 39 (reversing the trial court's order due to the State's failure to establish lack of capacity especially where the respondent provided his reasons for refusing the proposed medication).

The State argues that respondent's testimony that he stopped taking his medication only because it was not timely delivered was directly contradicted by Sims's testimony that respondent was given weekly pill packs of his medication. However, Sims did not testify that the medications were always timely delivered. Sims's testimony that respondent was hospitalized a few times while a client of ACTT and did not like ACTT's involvement reveals nothing about respondent's capacity. Moreover, even assuming that respondent did not comply with taking his medications, that fact is not clear and convincing evidence that he lacked the capacity to make a reasoned decision about his treatment options. Indeed, respondent's so-called "noncompliance" could simply have been a manifestation of a reasoned decision not to take the medication.

The State further contends that application of the *Israel* factors supports the trial court's order. The *Israel* factors were established by our appellate court as guidelines to consider when determining a respondent's capacity:

"(1) The person's knowledge that he has a choice to make;

(2) The person's ability to understand the available options, their advantages and disadvantages;

(3) Whether the commitment is voluntary or involuntary;

(4) Whether the person has previously received the type of medication or treatment at issue;

(5) If the person has received similar treatment in the past, whether he can describe what happened as a result and how the effects were beneficial or harmful; and

(6) The absence of any interfering pathologic perceptions or beliefs or interfering emotional states which might prevent an understanding of legitimate risks and benefits."

*Gloria C.*, 401 Ill. App. 3d at 282; *Israel*, 278 Ill. App. 3d at 37.

No single factor is dispositive and the court should consider any other relevant factor. *Gloria C.*, 401 Ill. App. 3d at 282; *Israel*, 278 Ill. App. 3d at 37.

Regarding the first factor, it was undisputed that respondent understood that he had a choice.

With respect to the second factor, as discussed above, respondent's testimony demonstrated an understanding of the proposed medications and the Invega he was taking.

Regarding the third factor, respondent was admitted to Elmhurst voluntarily. We are aware that on September 14, 2009, the day of the hearing on the State's petition, respondent had apparently been adjudicated to be a person subject to involuntary admission. However, at the hearing, Dr. Cullinane testified that respondent was in the hospital voluntarily. At most, this factor is neutral.

With respect to the fourth factor, it was undisputed that respondent received Haldol Decanoate "prn" several times.

Regarding the fifth factor, respondent testified that paramedics once had to be called because he choked on his tongue.

With respect to the final factor, there was no testimony about any interfering pathologic perceptions or interfering emotional states that might prevent an understanding of legitimate risks and benefits. Although Dr. Cullinane testified that respondent's "thought disorder" resulted in his not thinking "logically and clearly" when he was initially admitted to the hospital, Dr. Cullinane offered no testimony as to how respondent's illness impacted his ability to make a reasoned decision. Moreover, respondent's testimony revealed that he understood Dr. Cullinane's description of Risperdal Consta as being in the same family of drugs as the Invega he was taking and that he comprehended Dr. Cullinane's concern that he would stop taking his oral medication.

Consideration of the *Israel* factors leads to the conclusion that the trial court's finding that there was clear and convincing evidence that respondent lacked the capacity to make a reasoned decision about the medication was contrary to the manifest weight of evidence. See *Israel*, 278 Ill. App. 3d at 37-39 (applying the factors to reverse the trial court's involuntary treatment order).

We have no doubt that the State's witnesses and the trial court had respondent's best interests in mind. We even agree that a trial court finding that the proposed medications were in respondent's best interests would not be against the manifest weight of the evidence. Nonetheless, we must emphasize that a best-interests finding is not what the Code requires. Because psychotropic medication is invasive and includes possibly significant side effects, and because involuntary administration implicates important liberty interests, courts must exercise caution in entering such orders and require "firm proof" of the necessary statutory elements. See *In re David S.*, 386 Ill. App. 3d 878, 883-84 (2008) (reversing the trial court's order for lack of sufficient evidence in support of the State's petition). The Code prohibits the involuntarily administration of psychotropic medication unless the State clearly and convincingly establishes that, *inter alia*, the respondent lacks the capacity to make a reasoned decision for him- or herself. 405 ILCS 5/107.1(a—5)(4)(E) (West 2008).

Respondent next maintains that the trial court's order was against the manifest weight of the evidence regarding the combination of medications authorized and the persons authorized to administer the medication. Because our holding with respect to the State's burden of proving compliance with section 2—102(a—5) is dispositive, we will not address respondent's final argument. We do, however, caution the trial court when entering involuntary treatment orders to aim for consistency with the petition filed and the evidence presented. See *David S.*, 386 Ill. App. 3d at 884 (concluding that there was lack of continuity between what was requested in the State's petition and the evidence presented in support of the petition). This is perhaps especially pertinent where, as here, preprinted forms were used for the petition and the order. These preprinted forms each listed the "first choice" for medication (followed by a blank line) and "alternatives" (followed by three blank lines). On the amended petition, Dr. Cullinane wrote "also" after the word "alternatives," presumably consistent with his trial testimony that he intended to give the Haldol Decanoate in conjunction with the Risperdal Consta. However, the trial court's order contained the handwritten names of the medications (Risperdal Consta as the first choice and Haldol Decanoate as the alternative), without adding the word "also." Thus, the order was arguably inconsistent with the petition and the testimony.

For the reasons given, we reverse the judgment of circuit court of Du Page County.

Reversed.