# Illinois Official Reports

## Appellate Court

*In re Torry G.*, **2014 IL App (1st) 130709**

| | |
|---|---|
| Appellate Court Caption | *In re* TORRY G., Alleged to be a Person Subject to Involuntary Medication (The People of the State of Illinois, Petitioner-Appellee, v. Torry G., Respondent-Appellant). |
| District & No. | First District, Fifth District<br>Docket No. 1-13-0709 |
| Filed<br>Rehearing denied | July 18, 2014<br>September 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings on a petition for the involuntary administration of psychotropic medication to respondent, the trial court's order granting the petition was reversed, since respondent indicated that he was willing to voluntarily take certain medications but the State failed to meet its burden of showing that all of the medications respondent agreed to take would be "inappropriate," and, furthermore, there was no explanation for the failure to consider and rule on respondent's motion for a pretrial conference to settle the matter without a trial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2013-CoMH-142; the Hon. David Skryd, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Laurel Spahn, of Illinois Guardianship & Advocacy Commission, of Hines, for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People. |
| Panel | JUSTICE TAYLOR delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1 Respondent Torry G. appeals the trial court's order that he be administered involuntary psychotropic medication.

¶ 2 Torry was hospitalized in January 2013 and diagnosed with bipolar disorder and psychosis. On March 7, 2013, the trial court entered an order authorizing the involuntary administration of psychotropic medication to Torry for a period of 90 days. Torry now appeals that order. For the reasons that follow, we reverse.

¶ 3 I. BACKGROUND

¶ 4 Torry is a 21-year-old who has exhibited signs of mental illness for the past four years. He was admitted to Westlake Hospital on January 1, 2013, having consented to voluntary admission. On January 15, 2013, Torry's treating psychiatrist, Dr. Richard Goldberg, filed a petition to involuntarily administer psychotropic medication to Torry pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2-107.1 (West 2012)). The primary medications listed in the petition were Tegretol and Zyprexa, and the alternative medications were Depakote, fluphenazine hydrochloride, fluphenazine decanoate, Invega, Invega Sustenna, Haldol, and Haldol Decanoate.

¶ 5 Prior to the hearing on the petition, Torry's counsel filed a motion for a pretrial conference which stated the following:

"Respondent Torry G. has stressed to counsel that he would like to resolve this matter without a trial, and has requested that his treating psychiatrist (Dr. Goldberg) find the most appropriate medication to treat bipolar disorder with the least possible risk of side effects (Respondent has had side effects from the mood stabilizers Lithium and Depakote in the past)."

This motion was never ruled upon, and no pretrial conference was held.

¶ 6 At the hearing on the involuntary-medication petition, Dr. Goldberg testified that Torry was suffering from bipolar disorder, manic phase, with psychosis. He stated that Torry had been suffering from mental illness for the past four years. Over that time period, he had been

hospitalized 20 to 25 times,[1] including 4 separate times between October 8, 2012, and January 1, 2013. Dr. Goldberg opined that Torry's condition had deteriorated over time since April 2011, when he originally examined him. Regarding Torry's most recent hospitalization, Dr. Goldberg testified that when he was brought to the hospital, he was in an "exacerbated manic state." He stated that Torry's mother described him as "a captive or a prisoner in his own head" and believed that he "desperately" needed to be hospitalized. He further stated, "[Torry's mother] was pleading with me to make sure [Torry] gets forced medication." (Torry's mother did not testify at the hearing.)

¶ 7        Dr. Goldberg then described Torry's symptoms. He stated that Torry had "grandiose delusions," such as the belief that the purpose of the hearing was to try Dr. Goldberg for "crimes against patients" and that once Torry testified against him, Dr. Goldberg would be sent to jail. While in the hospital, Torry had exhibited sexually provocative and inappropriate behavior, such as attempting to make eye contact with female peers, sending them love letters, and, on one occasion, hugging a female peer without permission. He also believed that he had powers to heal women sexually by touching them. In addition, he displayed impulsive, agitated, and aggressive behavior.

¶ 8        Dr. Goldberg testified that Torry had told him repeatedly that he did not have a mental illness. He stated, "Our sessions are mostly Torry turning things around and making it about me and how I'm the bad person and I do bad things." As a result, Dr. Goldberg said, there was no opportunity to have therapeutic interaction about the behaviors that had caused his hospitalization.

¶ 9        Dr. Goldberg said that on several occasions, he had attempted to talk to Torry about the risks, benefits, and side effects of medication. However, "[i]t became apparent that he really just doesn't understand the need for the medication and there's no point in belaboring the matter." Dr. Goldberg opined that Torry did not have the capacity to make a reasoned judgment about taking medication because he did not believe he had an illness and did not appreciate the deterioration he was exhibiting as a result of his illness.

¶ 10        According to Dr. Goldberg, Torry claimed to be willing to take medication voluntarily, but on multiple occasions when Dr. Goldberg suggested specific medications, Torry refused. Dr. Goldberg stated that he believed that Torry was only willing to take medication with no side effects, and no such medication actually existed. For instance, three weeks prior to the hearing, Dr. Goldberg suggested to Torry that he take the drug Tegretol, a mood stabilizer used in the treatment of bipolar disorder (and one of the medications listed in the instant petition). Torry refused to take it, because he was concerned that the drug would cause him to have suicidal thoughts. Dr. Goldberg admitted that suicidal thoughts were a listed side effect of the drug, but he stated that they were a rare side effect and that if Torry experienced any suicidal thoughts, the medicine would be stopped at once. Nevertheless, Torry continued to refuse to take the drug. Dr. Goldberg concluded, "[Torry] has not been able to focus on the benefits. He can only focus on what he believes are the potential risks, which are often illogical or unfounded or–I think it serves his desire, as has been the case for years now, which is not taking medication."

---

[1]Counsel for Torry objected to this statement by Dr. Goldberg on the basis of foundation, but the objection was overruled.

¶ 11    Dr. Goldberg further testified that in his opinion, less restrictive alternatives to forced medication, such as group therapy and psychotherapy, were not appropriate for Torry, because he had never responded to therapy in a constructive or successful way. He stated that Torry's prognosis without medication was poor because he had displayed a pattern of progressive deterioration that Dr. Goldberg believed would continue, perhaps dangerously.

¶ 12    During cross-examination, counsel for Torry asked Dr. Goldberg about Invega and fluphenazine, two of the medicines that he sought to have administered to Torry. Dr. Goldberg admitted that Invega had not been approved for treatment of bipolar disorder. However, he said that Invega was the parent compound of the drug Risperdal, which was approved for treatment of bipolar disorder, "so there's no reason Invega can't be." As for fluphenazine, Dr. Goldberg admitted that it was in the same category as the drug Thorazine, which Torry had been given during his time at Westlake. Torry's Thorazine treatments had been discontinued because Torry experienced orthostatic hypotension.[2] Dr. Goldberg stated that hypotensive side effects were "not uncommon" with Thorazine but would be rare with fluphenazine.

¶ 13    Torry testified in opposition to the petition. He stated that "this all got started" when he was 17 and took marijuana that was laced with the hallucinogen PCP. He was hospitalized and taken to a psychiatric ward for evaluation. He was also given psychotropic medication. "I did not have the right to decline medicine because I was a minor," he said, "so I was experiencing these side effects and I didn't have the right to say no, I don't want to take these medicines." Before that incident, Torry said, he had never been in a hospital overnight. He said that his teachers had called him a "brilliant" student, and he received A grades when he made the effort to obtain them.

¶ 14    Torry then testified about the side effects that he had experienced as a result of psychotropic medication. He stated that he had been taken to the emergency room twice because of side effects. In one incident, he had headaches induced by the drug lithium that were severe enough that he was given morphine and had to have a spinal tap. In the other incident, he "fell over" while at outpatient treatment. Additionally, while in the hospital under Dr. Goldberg's care, he had muscle spasms that caused him to fall on the floor. He could not remember exactly which medications he was on at the time, because he was on more than four medications. Finally, regarding the medications that Dr. Goldberg requested for him in his petition, Torry stated that he had taken Depakote before. He testified that the drug made him restless and unable to sleep, and it also caused him to talk to himself and exhibit other "bizarre behavior."

¶ 15    Torry's counsel asked him whether he was opposed to taking medication for treatment of his mental illness. Torry replied that he was not concerned about minor side effects of medication, such as constipation or weight gain, but he was concerned about severe side effects, such as suicidal or homicidal thoughts. "I'm against those deadly side effects," he said, "because I would like to say this in the courtroom, some of those medicines that these

_____

[2]Orthostatic hypotension is "a sudden fall in blood pressure that occurs when a person assumes a standing position." NINDS Orthostatic Hypotension Information Page, *available at* http://www.ninds.nih.gov/disorders/orthostatic_hypotension/orthostatic_hypotension.htm (last visited June 10, 2014). Symptoms include dizziness, lightheadedness, blurred vision, and temporary loss of consciousness. *Id.*

doctors use, I see infomercials all the time saying you take this medicine or are you taking this medicine, you have a lawsuit." He testified that he would be willing to take safe, reliable medication that he would not need to get switched from. He also stated that he was "100 percent" willing to participate in outpatient services.

¶ 16    Regarding his own mental condition, Torry stated, "I can't say that I have full-blown bipolar, but I do realize that I had symptoms of bipolar, which I believe some of the symptoms were from certain medicines I received." He stated that he also had some schizoaffective symptoms and depression. He said, "I believe that those problems needed to be addressed because I didn't like what state I was in, but now my state is getting better." Torry's counsel asked him whether he had any symptoms right now that could benefit from treatment. Torry said that he had a problem with "continuous speech," although he believed it was more akin to a speech impediment than a mental disorder.

¶ 17    Torry testified that he got along "[v]ery poorly" with Dr. Goldberg because "he's an arrogant doctor in my honest viewpoint." He also testified that he participated in individual therapy sessions with his assigned hospital social worker, and those sessions helped him a lot. Most recently, he said, he discussed concerns surrounding his first hospitalization with his social worker, and the conversation was "very therapeutic."

¶ 18    Finally, Torry testified that he had never previously had an involuntary commitment order or an involuntary treatment order entered against him.

¶ 19    In addition to testifying on his own behalf, Torry also called to the stand Ronald Barthelemy, a discharge planner for behavioral health at Westlake Hospital. Barthelemy testified that he had spoken with Torry about his discharge plan and advised him to consider the Pilsen Wellness Center, an outpatient mental health center.

¶ 20    Torry's counsel then introduced into evidence a written statement from Torry's mother that was dated February 27, 2013, and included in Torry's medical chart. In that statement, Torry's mother said that she was willing to have Torry return home and live with her, provided that he would participate in the outpatient program at the Pilsen Wellness Center or a similar program, even though Torry had not agreed to take psychotropic medication at the hospital.

¶ 21    At the conclusion of the hearing, the trial court found by clear and convincing evidence that Torry had a mental illness. The court further stated:

"In his own testimony, [Torry] said he'd be willing to take certain medications, but he's got to get on some kind of treatment plan to take the medications, but you want to label it as involuntary, but that's just how the order is entered. It seems to me that he knows enough that he's got to get on some drug regimen to assess him, so at some point he can get out and do some kind of outpatient treatment, but they need to determine, based on his condition and his actions, he needs to get on the proper medication to assist him with all that."

The trial court granted the petition for involuntary administration of psychotropic medication to Torry for a period of 90 days. The order, entered on March 7, 2013, expired, by its own terms, on June 5, 2013.

## II. ANALYSIS

On appeal, Torry contends that the trial court erred in granting the petition for two reasons: first, the evidence favors a decision that Torry has the capacity to make a reasoned decision for himself about whether to take psychotropic medication, and second, Torry is willing to voluntarily take medication, which should be considered a less restrictive alternative to forced medication under section 2-107.1 of the Code. We need only consider the second of these contentions, because, for the reasons that follow, we find it to be dispositive of the instant appeal.

### A

The State, for its part, does not raise any argument regarding the merits of this appeal. Instead, it argues solely that we should dismiss Torry's appeal as moot, since the trial court's order expired on June 5, 2013.

An appeal is moot where no actual controversy is presented or where the issues raised below have ceased to exist, such that a reviewing court cannot grant relief to the appellant. *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1070 (2011). In this case, there can be no dispute that the underlying judgment is moot, since the involuntary medication order was limited in duration to 90 days and that period has long since passed. As a general rule, Illinois courts do not decide moot questions or render advisory opinions. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009); *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998).

Torry, however, argues that we may still consider this appeal under the public interest exception to the mootness doctrine. This exception allows a court to decide a moot case when (1) the question presented is substantially of a public nature, (2) there is a need for an authoritative determination for future guidance of public officers, and (3) there is a likelihood that the question will recur in the future. *In re J.B.*, 204 Ill. 2d 382, 387 (2003); *Alfred H.H.*, 233 Ill. 2d at 355.

In the present case, Torry's first contention–that the evidence shows that he has the capacity to make a reasoned decision about whether to take psychotropic medication–is purely a sufficiency of the evidence claim and, as such, does not qualify for the public interest exception. *Id.* at 356-57 (sufficiency of the evidence claims are "inherently case-specific reviews" that do not present broad public interest issues). However, Torry's second contention presents a question of law, namely, whether voluntary acceptance of medication can be considered a less restrictive alternative to court-ordered involuntary medication under the involuntary medication statute (405 ILCS 5/2-107.1 (West 2012)). This question of law involves the issue of statutory compliance and therefore qualifies as a matter of a public nature. *In re Donald L.*, 2014 IL App (2d) 130044, ¶ 20 (citing *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1071 (2011)). There is a need for an authoritative interpretation of the matter, since no Illinois case has directly addressed this question. Furthermore, there is a likelihood of future recurrence of this question because individuals who are willing to take medication can nonetheless find themselves facing a petition for involuntary medication. See, *e.g.*, *In re Israel*, 278 Ill. App. 3d 24, 31-32 (1996) (where respondent was voluntarily taking Valium, the State was not precluded from filing a petition to involuntarily administer Haldol and Risperdal to him); *Nicholas L.*, 407 Ill. App. 3d at 1067-68 (State filed an involuntary-medication petition where respondent consented to oral, but not injectable long-acting, medication). Accordingly, the public interest exception applies to permit review

of Torry's contention regarding his willingness to accept voluntary medication and the legal effect thereof.

¶ 29                                                            B

¶ 30          We therefore turn to consider the substantive issue in this appeal, namely, whether the trial court erred in authorizing the involuntary administration of psychotropic medication to Torry.

¶ 31          Our supreme court has observed that the administration of involuntary mental health services entails a " 'massive curtailment of liberty.' " *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)); see Dennis E. Cichon, *The Right to "Just Say No": A History and Analysis of the Right to Refuse Antipsychotic Drugs*, 53 La. L. Rev. 283, 284 (1992) ("Autonomous decisionmaking in matters affecting the body and mind is one of the most valued liberties in a civilized society."). When the State seeks to forcibly administer psychotropic medication to an individual, the interference with the individual's liberty is " 'particularly severe.' " *In re Robert S.*, 213 Ill. 2d 30, 46 (2004) (quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)). Consequently, our supreme court has held that mentally ill persons have a constitutionally protected liberty interest to refuse the administration of psychotropic medication. *In re C.E.*, 161 Ill. 2d 200, 213-14 (1994). However, the State also has a legitimate *parens patriae* interest in furthering the treatment of the mentally ill by forcibly administering psychotropic medication to patients who are incapable of making sound decisions. *Id.* at 217. These competing interests are balanced in the involuntary-medication statute, section 2-107.1 of the Code, which provides that psychotropic medication shall not be involuntarily administered to a patient unless all of the following factors are present:

"(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 2012).

See *C.E.*, 161 Ill. 2d at 218 (provisions of section 2-107.1 "are narrowly tailored to specifically address the State's concern for the well-being of those who are not able to make a rational choice regarding the administration of psychotropic medications"). The State bears

the burden of proving all of the statutory factors by clear and convincing evidence (405 ILCS 5/2-107.1(a-5)(4) (West 2012); *Nicholas L.*, 407 Ill. App. 3d at 1075), which is defined as a degree of proof that leaves no doubt in the mind of the fact finder as to the veracity of the proposition in question (*Israel*, 278 Ill. App. 3d at 35 (citing *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995))). We review the trial court's findings of fact under the manifest weight of the evidence standard, meaning that we defer to its findings unless the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not grounded in evidence. *In re C.S.*, 383 Ill. App. 3d 449, 451 (2008).

¶ 32    In this case, Torry contends that the State failed to prove by clear and convincing evidence that other, less restrictive services had been explored and found inappropriate, per subsection (F). He argues that he testified at trial that he was willing to take medication on a voluntary basis, and his voluntary acceptance of medication should be considered a less restrictive alternative than court-ordered involuntary medication. As noted previously, the State has waived all argument on this point. Ill. S. Ct. R. 341(h)(7), (i) (eff. Feb. 6, 2013) (points not argued are waived).

¶ 33    We begin by considering the legal question of whether a respondent's willingness to take medication voluntarily constitutes a "less restrictive service[ ]" within the meaning of section 2-107.1 of the Code.

¶ 34    As Torry points out in his brief, voluntary treatment is the preferred method for patients to receive mental health services in Illinois. See *In re Hays*, 102 Ill. 2d 314, 319-20 (1984). Examination of our case law reveals two reasons for this preference. First, since voluntary treatment is, by definition, agreed to by the patient in question, it does not invoke the " 'massive curtailment of liberty' " (*Barbara H.*, 183 Ill. 2d at 496 (quoting *Vitek*, 445 U.S. at 491)) that is attendant upon involuntary mental health services. Moreover, psychiatric evidence indicates that mental health treatment that is free from compulsion is more therapeutic and effective than forced treatment. *Hays*, 102 Ill. 2d at 319 (citing Developments in the Law, *Civil Commitments of the Mentally Ill*, 87 Harv. L. Rev. 1190, 1399 (1974)); *In re James E.*, 207 Ill. 2d 105, 114 (2003); *C.E.*, 161 Ill. 2d at 220-21 (where a patient is forcibly medicated and perceives the drug's effects as destructive and malignant, an antitherapeutic reaction can result that will worsen the patient's mental state). Thus, the provision of mental health services that are voluntary rather than involuntary, where possible, is consonant with our supreme court's expressed desire to provide mentally ill persons the most beneficial kind of treatment with the minimum amount of intrusion necessary to maintain protection of the public. See *In re Stephenson*, 67 Ill. 2d 544, 554 (1977).

¶ 35    In light of these considerations, any treatment to which a mental health patient is willing to consent should be considered a "less restrictive service[ ]" than forced treatment under section 2-107.1. Thus, when a patient is willing to take some forms of psychotropic medication, but not others, and the State seeks to forcibly administer medication in the latter category, the State must first prove by clear and convincing evidence that the drugs that the patient is willing to take "have been explored and found inappropriate" (405 ILCS 5/2-107.1(a-5)(4)(F) (West 2012)).

¶ 36    We now turn to apply this standard to the instant case. There was conflicting testimony at trial regarding Torry's willingness to take medication. Torry himself testified that he would be willing to take safe, reliable medication that he would not need to be switched from. Regarding the side effects of psychotropic medications, Torry stated that he was not

concerned about minor side effects, such as constipation or weight gain, but only about "deadly" side effects such as suicidal or homicidal thoughts. By contrast, Dr. Goldberg testified that Torry was only willing to take medication with no side effects, which, according to him, was functionally equivalent to being unwilling to take any medication at all.

¶ 37    Initially, we note that it is not clear whether Dr. Goldberg had a sufficient basis for his statement that Torry was not willing to take any medication that had any side effects. The only example he gave of a medicine that Torry refused to take was Tegretol, which does have potentially deadly side effects, namely, suicidal thoughts. He did not elaborate upon any other medications he might have asked Torry about. There is a significant logical gap between Torry's demonstrated unwillingness to take one particular drug with potentially deadly side effects and his purported unwillingness to take any drug that would be appropriate to treating his condition, and Dr. Goldberg's testimony does little to bridge that gap.

¶ 38    More importantly, though, it appears that the trial court found Torry's testimony to be more credible than Dr. Goldberg's testimony on this point. At the close of the hearing, the trial court issued the following findings of fact:

> "In his own testimony, *[Torry] said he'd be willing to take certain medications*, but he's got to get on some kind of treatment plan to take the medications, but you want to label it as involuntary, but that's just how the order is entered. It seems to me that *he knows enough that he's got to get on some drug regimen* to assess him, so at some point he can get out and do some kind of outpatient treatment, but they need to determine, based on his condition and his actions, he needs to get on the proper medication to assist him with all that." (Emphases added.)

This statement shows that the trial court credited Torry's testimony that he was willing to take certain medications and that he "knows enough that he's got to get on some drug regimen." In light of these findings, involuntary medication would only be permissible under section 2-107.1 if the State showed that all of the medications which Torry was willing to take would be "inappropriate" (405 ILCS 5/2-107.1(a-5)(4)(F) (West 2012)) to treat his condition.

¶ 39    The State failed to make any such showing. Of the nine medications listed in the petition, Dr. Goldberg testified that Torry refused to take Tegretol, and Torry testified that he had previously experienced unpleasant side effects from taking Depakote. As for the remaining seven medications, no testimony was adduced at trial regarding Torry's willingness (or lack thereof) to take them. Nor was it shown that the medications which Torry would have been willing to take were not appropriate as a substitute for the medications in the petition. *Israel*, 278 Ill. App. 3d at 31-32, is illustrative because of the contrast it presents with the instant case. In *Israel*, even though the respondent was voluntarily taking Valium, the court held that the State was not precluded from seeking to involuntarily administer Haldol and Risperdal to him.[3] *Id.* at 32. The court based this conclusion upon medical testimony that the respondent was only taking Valium to treat his anxiety, not for behavioral modification, and that the only medications which would treat his delusions and paranoia were Haldol and Risperdal. *Id.* By

---

[3]The issue in *Israel* was not the "less restrictive services" clause of section 2-107.1; rather, it was a challenge to the court's subject matter jurisdiction. *Id.* at 31. Nonetheless, we find the court's analysis to be cogent here.

contrast, in the instant case, Torry testified and the trial court found that he was willing to take medication, but there was no testimony establishing that such medication could not effectively treat his mental illness. In the absence of such a showing, it cannot be said that the State met its burden of proof by clear and convincing evidence, and the trial court's finding to the contrary was against the manifest weight of the evidence. See *C.S.*, 383 Ill. App. 3d at 451 (finding is against the manifest weight of the evidence where it is not grounded in evidence).

¶ 40　　As a concluding matter, we note that, prior to trial, counsel for Torry filed a motion for a pretrial conference to try and settle the matter without need for a trial. In that motion, Torry "requested that his treating psychiatrist (Dr. Goldberg) find the most appropriate medication to treat bipolar disorder with the least possible risk of side effects." At the start of the trial, the parties and the court had an off-the-record discussion about this motion, but it was never officially ruled upon and no pretrial conference was held. It is unclear from the record why this motion was not granted. Nor shall we speculate on the trial court's reasons. We simply note that, where a respondent is willing to voluntarily take psychotropic medication, a pretrial settlement would be favored, since it would serve the ends of judicial economy as well as protecting the respondent's liberty interests and effectuating treatment. See *Robert S.*, 213 Ill. 2d at 46 (forcible administration of psychotropic medication is a particularly severe interference with an individual's liberty); *Hays*, 102 Ill. 2d at 319 (psychiatric evidence shows that voluntary mental health treatment is more effective than forced treatment).

¶ 41　　　　　　　　　　　　　　　III. CONCLUSION

¶ 42　　For the foregoing reasons, we find that the State failed to prove by clear and convincing evidence that less restrictive services had been explored and found inappropriate, and, therefore, the trial court erred in granting the petition to involuntarily administer psychotropic medication to Torry. See 405 ILCS 5/2-107.1(a-5)(4)(F) (West 2012).

¶ 43　　Reversed.