# Illinois Official Reports

## Appellate Court

*In re Robert M.*, 2020 IL App (5th) 170015

| | |
|---|---|
| Appellate Court Caption | *In re* ROBERT M., a Person Found Subject to Involuntary Medication (The People of the State of Illinois, Petitioner-Appellee, v. Robert M., Respondent-Appellant). |
| District & No. | Fifth District<br>No. 5-17-0015 |
| Filed | February 28, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 16-MH-148; the Hon. Donald M. Flack, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Veronique Baker and Laurel Spahn, of Illinois Guardianship & Advocacy Commission, of Hines, for appellant.<br><br>Thomas D. Gibbons, State's Attorney, of Edwardsville (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE WHARTON delivered the judgment of the court, with opinion.
Presiding Justice Welch and Justice Moore concurred in the judgment and opinion.

## OPINION

¶ 1  The respondent, Robert M., raises two arguments in this appeal from an order finding him to be subject to the involuntary administration of psychotropic medication. First, he argues that there was insufficient evidence to prove by clear and convincing evidence that he was suffering, one of the statutory requirements for the involuntary administration of psychotropic medication. See 405 ILCS 5/2-107.1(a-5)(4)(B)(ii) (West 2016). Second, he argues that there was insufficient evidence to prove that less restrictive treatments were explored and found to be inappropriate, another statutory requirement. See *id.* § 2-107.1(a-5)(4)(F). In particular, he points out that there was evidence that he was willing to take an antianxiety medication, one of the types of medication his treating psychiatrist wanted to administer. He argues that there was no evidence that voluntarily administering an antianxiety medication would have been inappropriate. We affirm.

¶ 2  I. BACKGROUND

¶ 3  Robert was 32 years old at the time of the proceedings in this matter. He had a history of mental illness that dated back to when he was 10 years old, which required several previous admissions to psychiatric facilities.

¶ 4  On July 21, 2016, Robert was admitted to Alton Mental Health Center (Alton) after being found unfit to stand trial. His treating psychiatrist at Alton was Dr. Jagannath Patil. On August 12, 2016, the State filed a petition seeking to involuntarily administer psychotropic medication to Robert. In a supporting affidavit, Dr. Patil indicated that he wanted to administer medications to control anxiety and symptoms of psychosis, including paranoid delusions.

¶ 5  At the time of his admission to Alton, Robert was experiencing pain from several infected teeth. He attributed his anxiety to his dental pain. While at Alton, Robert received dental care for his problem. He took two rounds of antibiotics for the infection and had two teeth filled. The dentist also recommended that five teeth be extracted. At the time of the hearing in this matter, Robert was still awaiting an appointment at Southern Illinois University School of Dental Medicine to have the teeth extracted.

¶ 6  On September 1, 2016, the court held a hearing on the petition for involuntary administration of psychotropic medication. Dr. Patil testified that he diagnosed Robert with schizoaffective disorder, bipolar type. As a result of this disorder, Robert experienced paranoid delusions, anger, hostility, increased speech, and increased psychomotor activity. Dr. Patil stated that Robert also experienced somatic preoccupations. Asked to explain, he noted that Robert believed that taking antibiotics helped him to think more clearly because they "slow[ed] down his brain." He also noted that Robert told him that the fever from his infected teeth was interfering with his ability to think clearly.

¶ 7        Dr. Patil testified that Robert exhibited a deterioration in his ability to function. Asked to explain, he noted that Robert typically only slept four to five hours a night. He described Robert as being always "on guard" and frequently argumentative. Dr. Patil described some of the paranoid beliefs expressed by Robert. For example, he testified that Robert believed that staff members were "messing up with his locked toothbrushes." He further testified that Robert asked to shower alone due to paranoid fears. Dr. Patil testified that on one occasion, Robert refused to take Tylenol for his tooth pain even though he had requested it. He testified that Robert spit out the tablet, insisting that it was not really Tylenol. When a staff member showed him the box, Robert continued to insist that the tablet was something other than Tylenol, and he accused staff members of conspiring against him to turn him into a "zombie."

¶ 8        Dr. Patil opined that Robert was suffering as a result of his symptoms. He noted that Robert reported to his treatment team that he was "in duress with anxiety." Dr. Patil testified that Robert complained that the staff was neglecting his pain, anxiety, and medical needs, but when staff members asked him what they could do to help, Robert accused them of being "too aggressive."

¶ 9        When asked if Robert exhibited threatening behavior, Dr. Patil described three incidents. In one incident, Robert threw a chair against the wall during an argument with a nurse. The following night, he was awake most of the night slamming doors and talking loudly. During this incident, Robert threatened to "write up" staff members so they would be fired. Another time, Robert could be heard yelling and cursing angrily while he took a shower. Dr. Patil testified, however, that it was not necessary to medicate Robert on an emergency basis during any of these incidents or at any other time.

¶ 10       Dr. Patil testified that Robert reported suffering from depression and posttraumatic stress. Robert indicated to Dr. Patil that he "might" need to take Klonopin, an antianxiety medication he had taken prior to his admission to Alton. Dr. Patil testified, however, that Robert felt he did not need to take antipsychotic medications because he was " 'in control of [his] own paranoia.' "

¶ 11       Dr. Patil did not have access to all of Robert's medical records. Instead, he elicited information from Robert on what medications he had taken in the past, although he testified that he did not know whether Robert was an "accurate historian." Robert told Dr. Patil that he previously took risperidone, haloperidol (Haldol), Invega, Thorazine, and Seroquel. Robert reported that he had "bad experiences" with risperidone, Haldol, and Invega. When asked what kind of bad experiences Robert had with these medications, Dr. Patil replied, "I mean, he did not elaborate, but I'm sure he may have experienced some side effects."

¶ 12       Dr. Patil was asked whether less restrictive treatments had been explored. In response, he noted that Robert participated in classes and therapy sessions. However, he opined that these alternatives were not adequate to treat Robert's symptoms unless used in conjunction with medication.

¶ 13       On cross-examination, Dr. Patil acknowledged that Robert was eating and taking showers and that his hygiene had improved. He further acknowledged that Robert's progress reports included entries indicating that he was interacting with others and cooperating with unit expectations. Dr. Patil testified that although Robert indicated that he might need to take Klonopin, he did not sign a consent form. We note that Dr. Patil did not indicate whether Robert was ever asked to sign a consent form.

¶ 14    Robert testified in his own behalf. Asked which medications he has taken in the past, Robert replied, "I've been on a whole variety of medications that there was no success because *** there has been no solid proof of any of the illnesses that they've accused me of having." He testified that he has taken Ativan, Invega, Risperdal, Thorazine, Zyprexa, Haldol, and "a lot of antibiotics. A whole lot of antibiotics." Robert was asked what side effects he experienced while taking these medications. He testified that Thorazine and Invega caused fever and rashes and that he experienced swelling in his throat after receiving injections. However, he could not remember which medications caused the swelling because they were administered a long time ago. He also testified that he blacked out and experienced redness in his eyes, but he did not specify which medications caused these side effects.

¶ 15    Robert acknowledged that he banged on the window to the nurses' station in order to get the attention of the nurses so he could request Tylenol. He explained that he was "desperate for Tylenol" because he was running a fever, which he believed was "cooking [his] brain." He further testified that the infection from his teeth was spreading though his blood and that no one had "thoroughly checked" for infection throughout his system.

¶ 16    Robert testified that he was currently willing to take an antianxiety medication because the pain from his teeth was making him irritable. He indicated, however, that he did not believe he would need to take an antianxiety medication once his dental treatment was complete. Finally, Robert accused staff members of threatening to tell the doctors to medicate him against his will.

¶ 17    The last witness to testify was Anne Crane, Robert's mother. She testified that Robert lived with her prior to his admission to Alton. Crane described her son as being able to function reasonably well at home. She testified that he was able to take care of himself with no assistance and that he was also able to assist her due to her physical disability. She noted that he also worked on the family's vehicles. Crane did not believe that Robert should be medicated with antipsychotic medications, but she did believe he needed an antianxiety medication. She testified that there were several recent stressors in Robert's life. She explained that a year earlier, she was on life support in the emergency room, and emergency room personnel recommended that her husband execute a do not resuscitate order. In addition, she testified that Robert's father and brother both died and that his dental problems had been going on for a few years because he had no insurance to pay for the necessary care.

¶ 18    After hearing the arguments of the parties, the court ruled from the bench. The court began by finding that the State did not present clear and convincing evidence that Robert exhibited either threatening behavior or a deterioration in his ability to function. See 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2016). The court therefore turned its attention to the issue of suffering. See *id.* The court noted that there is an "ongoing issue in the Appellate Courts as to what is sufficient to constitute suffering." The court then highlighted Dr. Patil's testimony describing "the level of anxiety and mood symptoms" experienced by Robert. The court emphasized that "the word 'duress' was used." The court found that this "level of symptomology is sufficient in and of itself to constitute suffering under the law with or without manifestation of physical symptoms."

¶ 19    The court noted, however, that it was "possible that there [was] a manifestation of physical symptoms in this case caused by mental suffering." This was so, the court explained, because some of Robert's beliefs regarding "all of his physical symptomology [were] not supported by the medical testimony and evidence in the record."

¶ 20    The court then addressed the question of whether Robert lacked the capacity to make a reasoned decision regarding his treatment. See *id.* § 2-107.1(a-5)(4)(E). The court found that Robert's beliefs about his physical symptoms interfered with his ability to make a reasoned decision regarding his care. It later clarified that Robert's "inability to properly distinguish between the physical and mental issues that he's having" rendered him unable to make a reasoned decision regarding the proposed treatment.

¶ 21    The court next considered whether less restrictive treatments had been explored and found to be inappropriate. See *id.* § 2-107.1(a-5)(4)(F). The court found that clear and convincing evidence showed that less restrictive treatments had been considered. The court stated, "[i]t's not that they're inappropriate, but [they are not] sufficient to treat this without the medication."

¶ 22    The court further found that Robert suffered from a serious mental illness that had been marked by the continuing presence of symptoms (see *id.* § 2-107.1(a-5)(4)(A), (C)) and that the benefits of the proposed treatment outweighed the risk of harm (see *id.* § 2-107.1(a-5)(4)(D)). The court therefore granted the petition and entered an order authorizing the involuntary administration of psychotropic medication that day.

¶ 23    On September 27, 2016, Robert filed a motion to reconsider. He argued that the State failed to prove by clear and convincing evidence that he exhibited suffering.

¶ 24    The motion to reconsider did not come before the court for a hearing until December 22, by which time the order had expired. The court therefore asked the parties to address the question of mootness.

¶ 25    Counsel for Robert M. argued that two exceptions to the mootness doctrine applied—the public interest exception and the collateral consequences exception. She then turned to the merits, pointing out that suffering is a subjective question. Counsel argued that in this court's then-recent decision in *In re Debra B.*, 2016 IL App (5th) 130573, we reversed an involuntary medication order, in part because we held that the psychiatrist's "mere recitation of [the respondent's] symptoms" was insufficient to support a finding that she exhibited suffering where the psychiatrist did not also "explain how [the] symptoms caused her to feel grief, anxiety, depression, or any other type of emotional distress." *Id.* ¶¶ 41, 45. Although counsel acknowledged that Dr. Patil provided more of an explanation in this case than he did in *Debra B.*,[1] she argued that anxiety alone is not enough to demonstrate that a respondent is suffering.

¶ 26    Counsel for the State noted that the order authorizing involuntary medication had expired and that Robert had been discharged from his commitment at Alton. As such, she argued, the order was moot. Counsel did not address exceptions to the mootness doctrine or the merits of Robert's arguments.

¶ 27    The court found that the motion to reconsider was moot and that no exception was applicable. In so holding, the court noted that trial courts, unlike appeals courts, do not set public policy. Despite this finding, the court went on to discuss the merits of the motion. The court first explained that this case is distinguishable from *Debra B.* because here the treating psychiatrist testified that Robert felt anxiety that was "not just ordinary daily anxiety ***, but an intense type and [he] was actually under duress." The court further noted that Robert's paranoid delusions caused him to refuse pain medication while he was experiencing physical

---

[1]We note that Dr. Patil was also Debra B.'s treating psychiatrist.

pain, which added to his suffering. Finally, the court noted that despite its earlier ruling to the contrary, the court believed the evidence was sufficient to support a finding that Robert exhibited a deterioration in his ability to function. The court reiterated that it found the issues raised in the motion to be moot but stated that it would find that both criteria were met if it were to rule on the merits. The court dismissed the motion to reconsider. This appeal followed.

¶ 28                                    II. ANALYSIS
¶ 29                                    A. Mootness
¶ 30        Before addressing the merits of this appeal, we note that it is technically moot. Because the order authorizing the involuntary administration of psychotropic medication has expired, our decision in this case will not grant Robert effective relief from that order. See *In re Joseph M.*, 398 Ill. App. 3d 1086, 1087 (2010). Illinois courts ordinarily lack jurisdiction to decide moot questions, render advisory opinions, or address issues where our decision will not affect the result. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). Although most mental health cases fall within one or more of the recognized exceptions to the mootness doctrine, "there is no *per se* exception to mootness that universally applies to mental health cases." *Id.* at 355.

¶ 31        The three recognized exceptions to the mootness doctrine are (1) the public interest exception, (2) the capable-of-repetition-yet-evading-review exception, and (3) the collateral consequences exception. *In re Beverly B.*, 2017 IL App (2d) 160327, ¶ 19. Robert argues that all three exceptions apply to both of his claims. The State agrees that the collateral consequences exception applies to both claims. The State also agrees that the public interest exception applies to the question of whether a respondent's willingness to voluntarily take some, but not all, of the proposed medications must be considered as a less restrictive alternative to involuntary medication. The State argues, however, that the public interest exception does not apply to Robert's arguments concerning the evidence that he exhibited suffering and that the capable-of-repetition-yet-evading-review exception is not applicable to either claim. We find that the public interest exception is applicable to both claims.

¶ 32        The public interest exception allows us to consider issues that are otherwise moot if (1) the case presents questions of a public nature, (2) there is a need for an authoritative determination to guide public officials, and (3) the questions presented are likely to recur. *Alfred H.H.*, 233 Ill. 2d at 355. The procedures courts must follow before authorizing the involuntary administration of psychotropic medication are "a matter of 'substantial public concern.' " *In re Evelyn S.*, 337 Ill. App. 3d 1096, 1102 (2003) (quoting *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002)). Challenges to the sufficiency of the evidence "are inherently case-specific" and thus do not generally "present the kinds of broad public interest issues" that are present in other mental health cases. *Alfred H.H.*, 233 Ill. 2d at 356-57. However, claims that "relate to the type of evidence the State must present to meet its statutory burden, rather than the weight of the evidence presented," have " 'broader implications than most sufficiency-of-the-evidence claims.' " *In re H.P.*, 2019 IL App (5th) 150302, ¶ 17 (quoting *In re Joseph M.*, 405 Ill. App. 3d 1167, 1173 (2010)).

¶ 33        Both of Robert's claims challenge the sufficiency of the evidence. However, his first claim turns on what type of evidence will support a finding that a respondent is exhibiting suffering. Similarly, his second claim turns on the question of whether, and under what circumstances, a respondent's willingness to voluntarily take some of the proposed medications constitutes a less restrictive form of treatment. These questions are matters of great public concern. There

are few Illinois cases addressing either issue. This court has not previously considered the questions raised in Robert's less-restrictive-treatment argument. Although we addressed the issue of suffering in *Debra B.*, we believe it would be appropriate to clarify some of the language in that decision. We therefore find that an authoritative determination of both issues is needed. Finally, because of the short duration of orders authorizing the involuntary administration of psychotropic medication, these issues are likely to recur without the opportunity to be fully litigated before becoming moot. See *id.* ¶ 18 (citing *Mary Ann P.*, 202 Ill. 2d at 402-03). We will therefore consider both of Robert's arguments under the public interest exception.

¶ 34                                 B. Applicable Law

¶ 35    Turning to the merits, we begin by emphasizing the fundamental nature of the rights at issue in this appeal. As our supreme court has stated, the administration of any involuntary mental health services to an unwilling patient entails a " 'massive curtailment of liberty.' " *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). Involuntary administration of psychotropic medications is especially intrusive due to the " 'substantially invasive nature' " of these medications, their risk of serious side effects, and the potential for such medications to be misused as a means of managing patients rather than treating their symptoms. *H.P.*, 2019 IL App (5th) 150302, ¶ 20 (quoting *In re C.E.*, 161 Ill. 2d 200, 214-15 (1994), and citing *In re Robert S.*, 213 Ill. 2d 30, 46 (2004)). For these reasons, Illinois courts recognize that mental health patients have a constitutionally protected right to refuse psychotropic medications. *C.E.*, 161 Ill. 2d at 213-14.

¶ 36    We also recognize, however, "that the state has a legitimate *parens patriae* interest in furthering the treatment" of mentally ill patients who are incapable of making reasoned decisions regarding their treatment. *Id.* at 217. The procedures in the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et seq.* (West 2016))—including the statute authorizing the involuntary administration of psychotropic medication—were "enacted by our legislature to ensure that Illinois citizens are not subjected to [involuntary mental health] services improperly." *Barbara H.*, 183 Ill. 2d at 496. The statute provides that a patient may not be medicated against his will unless a court finds by clear and convincing evidence:

> "(A) That the recipient has a serious mental illness or developmental disability.
>
> (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms ***, (ii) suffering, or (iii) threatening behavior.
>
> (C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) *** or the repeated episodic occurrence of these symptoms.
>
> (D) That the benefits of the treatment outweigh the harm.
>
> (E) That the recipient lacks the capacity to make a reasoned decision about the treatment.
>
> (F) That other less restrictive services have been explored and found inappropriate." 405 ILCS 5/2-107.1(a-5)(4)(A)-(F) (West 2016).

The court may not authorize the involuntary administration of psychotropic medication unless it finds that all six of these factors are present. *In re Gail F.*, 365 Ill. App. 3d 439, 446 (2006).

¶ 37       On appeal, we review the trial court's factual findings to determine whether they are against the manifest weight of the evidence. *Debra B.*, 2016 IL App (5th) 130573, ¶ 24. However, we conduct a *de novo* review of the court's rulings on questions of law. See *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010); *In re Alaka W.*, 379 Ill. App. 3d 251, 259 (2008). Whether a patient's willingness to take some medications voluntarily is a " 'less restrictive' " treatment within the meaning of the statute is a question of law. *In re Torry G.*, 2014 IL App (1st) 130709, ¶ 33. We will therefore consider that question *de novo*.

¶ 38                                        C. Suffering

¶ 39       Robert first argues that there was insufficient evidence to support the court's finding that he was suffering. There are three components to this argument. First, Robert correctly points out that the State must demonstrate something more than the fact that a respondent is mentally ill before a court may authorize the involuntary administration of psychotropic medication. *Beverly B.*, 2017 IL App (2d) 160327, ¶ 43; *Debra B.*, 2016 IL App (5th) 130573, ¶ 36. He emphasizes the court's finding that his "level of symptomology" was "sufficient in and of itself to constitute suffering." He argues that this finding was "tantamount to holding that any patient with a serious mental illness is subject to involuntary administration of medication," a holding we found to be "untenable" in *Debra B.* See *Debra B.*, 2016 IL App (5th) 130573, ¶ 45. Second, Robert points to his own belief that his anxiety was related to the pain from his infected teeth. He argues that because neither the physical pain nor the anxiety related to his dental problems were caused by his mental illness, they could not support a finding that he was suffering "because of [his] mental illness." See 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2016). Third, he points to the court's statements regarding the "possibility" that his mental illness caused a "manifestation of physical symptoms." He argues that a mere possibility is not sufficient to support a finding of suffering by clear and convincing evidence. We find all three arguments unavailing. We address them in turn.

¶ 40       Robert relies heavily on our holding in *Debra B.* to support his claim that the court's reliance on his symptomology was, in essence, a finding that he was subject to the involuntary administration of psychotropic medications based solely on the fact that he is mentally ill. We find *Debra B.* to be distinguishable.

¶ 41       There, the respondent's symptoms included racing thoughts, pressured speech, increased psychomotor activity, florid mania, and grandiose delusions. *Debra B.*, 2016 IL App (5th) 130573, ¶ 4. At the hearing on a petition for involuntary administration of psychotropic medication, Debra's treating psychiatrist (Dr. Patil) was asked to explain why he believed that she was suffering. He replied, " 'All the symptoms that she exhibited is a suffering basically.' " *Id.* ¶ 7. He then testified that Debra was " 'incessantly writing,' " and he opined that her writings indicated that she was suffering. *Id.* Dr. Patil described the contents of some of Debra's writings—letters addressed to Alton staff members, the St. Louis Cardinals, and Prince William and Kate Middleton. The letters were signed by "God," "The Mother of the Holy Ghost," "Witchpoo," and "Queen Debra of Czechoslovakia." *Id.* ¶¶ 8-10. In one letter, Debra wrote, " 'I am tired of this bull***. Get it together.' " *Id.* ¶ 8. However, nothing else in the contents of the letters gave any obvious indication that Debra was angry, sad, or fearful.

¶ 42      On the other hand, Debra herself testified that she was "suffering" because of her involuntary admission. *Id.* ¶ 17. She explained that she missed her daughter and that she was worried that her daughter would be unable to manage caring for Debra's elderly mother, four dogs, and two cats in her absence. *Id.* The trial court found this evidence sufficient to prove by clear and convincing evidence that Debra was suffering. *Id.* ¶ 18.

¶ 43      In reversing this ruling on appeal, this court first noted that the term "suffering" is not defined in the Mental Health Code and must therefore be afforded "its plain and ordinary meaning." *Id.* ¶ 38. After considering dictionary definitions for the word "suffering," we held that "to prove that a respondent is suffering, the State must show that she is experiencing physical pain *or emotional distress*." (Emphasis added.) *Id.*

¶ 44      We next considered the only two previous Illinois appellate decisions to address the question of suffering—*In re Wendy T.*, 406 Ill. App. 3d 185 (2010), *overruled on other grounds by In re Rita P.*, 2014 IL 115798, ¶¶ 33-34, and *In re Lisa P.*, 381 Ill. App. 3d 1087 (2008). The respondent in *Wendy T.* often became angry because she was unable to communicate effectively or perform basic tasks. *Debra B.*, 2016 IL App (5th) 130573, ¶ 39 (citing *Wendy T.*, 406 Ill. App. 3d at 188). In *Lisa P.*, the respondent experienced rage and paranoia as a result of her illness. *Id.* ¶ 40 (citing *Lisa P.*, 381 Ill. App. 3d at 1090). In both of those cases, the appellate courts found the evidence sufficient to support the trial courts' findings that the respondents were suffering. *Id.* ¶¶ 39-40.

¶ 45      We found "two significant distinctions" between both of those cases and *Debra B.* We explained, "First, both cases included at least *some* evidence that the respondents were suffering beyond a mere recitation of their symptoms." (Emphasis in original.) *Id.* ¶ 41. We further explained, "Second, the symptoms experienced by both Wendy T. and Lisa P. lead more readily to an inference that they were suffering than do the symptoms described by Dr. Patil here." *Id.* ¶ 42. In this case, Robert emphasizes the first of these two distinctions in arguing that Dr. Patil's testimony here likewise provided no evidence of suffering "beyond a mere recitation of [his] symptoms." As we stated in the second distinction, however, if there is a clear nexus between the symptoms themselves and a respondent's suffering, the symptoms themselves may be enough to support a finding of suffering.

¶ 46      We went on to discuss the type of evidence that would support a finding of suffering. We explained:

> "Although we do not believe that evidence of physical manifestations of depression is necessary to meet the clear-and-convincing standard, we do believe that the State must provide some factual basis for an assertion that a respondent is suffering. For example, the medical expert might testify that the respondent has reported feeling sorrow, frustration, anger, anxiety, or some other intense negative emotion, or that the respondent has behaved in a manner that indicates she is experiencing some sort of emotional anguish." *Id.* ¶ 44.

In *Debra B.*, we found the record devoid of this type of evidence. *Id.* It is for this reason we concluded that holding that the evidence in that case was sufficient to support a finding of suffering "would be tantamount to holding that any patient with a serious mental illness is subject to involuntary administration of medication." *Id.* ¶ 45.

¶ 47      In this case, by contrast, Dr. Patil testified that Robert experienced somatic preoccupations and paranoid delusions. As we discussed earlier, Robert believed that his fever was "cooking his brain" and that his dental infection was spreading throughout his bloodstream. It is easy to

understand why such beliefs would cause fear and anxiety. Similarly, there is evidence that Robert believed that members of the staff at Alton were conspiring against him. As we noted in *Debra B.*, paranoid delusions might "cause anyone to feel isolated and fearful." *Id.* ¶ 42. It is worth noting that on at least one occasion, Robert's paranoia led him to refuse pain medication, which would have alleviated the suffering from his tooth pain. Although we agree with Robert that the physical pain from his dental infection did not constitute suffering caused by his mental illness, his refusal to take medication to alleviate some of that pain *was* caused by his mental illness and did add to his suffering. While this incident, standing alone, might not be enough to warrant involuntary medication based on suffering, it does provide additional evidence in support of the trial court's finding.

¶ 48 Moreover, Dr. Patil testified that Robert behaved angrily and reported feeling severe anxiety. This is precisely the type of evidence we said the State could present to support a finding of suffering in *Debra B.* See *id.* ¶ 44. We believe that this evidence—unlike the evidence presented in *Debra B.*—was sufficient to support the court's finding that Robert was suffering.

¶ 49 The second component of Robert's argument—concerning the sufficiency of the evidence that he exhibited suffering—revolves around his testimony that his anxiety stemmed from the pain he was experiencing due to his infected teeth. In addition, Robert's mother indicated that he may have been feeling anxiety due to other outside events. As Robert correctly contends, a patient may not be medicated against his will based on a finding of suffering unless the State proves that he is suffering "*because of* [his] mental illness." (Emphasis added.) 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2016). Here, however, as we have discussed at length, there was ample evidence to support a finding that much of Robert's anxiety stemmed from his mental illness, particularly his paranoia and his somatic preoccupations. The fact that his feelings of anxiety may have been exacerbated by factors other than his illness does not alter our conclusion.

¶ 50 Finally, Robert points to the court's statements opining that it was "possible" that Robert was experiencing physical manifestations of suffering as a result of the symptoms of his mental illness and that the evidence did not support all of the physical symptoms he described. We agree with Robert that a mere possibility is not enough to meet the clear-and-convincing standard. See *In re Bontrager*, 286 Ill. App. 3d 226, 230 (1997). We also agree that there is no indication in the record that Robert was not actually experiencing pain or a fever from his dental infection. Although it is not clear what the court was referring to when it referenced symptomology that was not supported by the evidence, this may have been a reference to Robert's testimony that his fever was "cooking his brain" and that the infection from his teeth was spreading through his blood. However, there is no indication in the record that Robert experienced any psychosomatic symptoms or physical manifestations as a result of these beliefs. Nevertheless, the court did not rely on the possibility of physical manifestations in finding that Robert was suffering; as stated earlier, the court found that the evidence of his severe anxiety and paranoid delusions was sufficient to prove by clear and convincing evidence that he exhibited suffering. For the reasons we have already discussed, we find that this conclusion was supported by the evidence.

¶ 51                                    D. Less Restrictive Services

¶ 52        Robert next argues that there is no evidence that the less restrictive alternative of allowing him to voluntarily take Klonopin was explored and found to be inappropriate. We first note that Robert forfeited review of this question by failing to raise it before the trial court, either at the hearing or in his motion to reconsider.[2] However, forfeiture is a limitation on the parties, not the courts. See *Wilson v. Humana Hospital*, 399 Ill. App. 3d 751, 757 (2010). As we mentioned earlier, this court has not previously addressed this issue, and we believe guidance would be useful. We therefore choose to address Robert's arguments.

¶ 53        Only one Illinois case has squarely addressed the precise question before us—*In re Torry G.*, 2014 IL App (1st) 130709. However, in the context of admission to a facility, Illinois courts have repeatedly held that voluntary mental health services are preferable to involuntary treatment, if possible. *In re James E.*, 207 Ill. 2d 105, 114 (2003) (explaining "that one of the purposes of the [Mental Health] Code was the encouragement of voluntary admissions"); *In re Splett*, 143 Ill. 2d 225, 233 (1991) (same); *In re Hays*, 102 Ill. 2d 314, 319 (1984) (stating that voluntary admission "generally is considered to be the preferred method of commencing treatment of mental illness"). There are two reasons for this preference. First, obviously, voluntary treatment does not involve the substantial intrusion on a patient's liberty that is involved in involuntary treatment. *Torry G.*, 2014 IL App (1st) 130709, ¶ 34. Second, voluntary treatment is more effective than involuntary treatment. See *James E.*, 207 Ill. 2d at 114; *Splett*, 143 Ill. 2d at 233-34; *Hays*, 102 Ill. 2d at 319; *Torry G.*, 2014 IL App (1st) 130709, ¶ 34.

¶ 54        In *Torry G.*, the First District considered this principle in the context of involuntary administration of psychotropic medication. The respondent in that case voluntarily admitted himself to a private hospital for mental health treatment. His treating psychiatrist filed a petition to involuntarily medicate him. *Torry G.*, 2014 IL App (1st) 130709, ¶ 4. At a hearing on that petition, the psychiatrist testified that although Torry stated that he was willing to take medication willingly, he refused to take all of the specific medications the psychiatrist suggested. *Id.* ¶ 10. This led the doctor to believe that Torry "was only willing to take medication with no side effects, and no such medication actually existed." *Id.*

¶ 55        Torry, by contrast, testified that he was willing to take medications with minor side effects, but he did not want to take medications with severe side effects. *Id.* ¶ 15. He further testified that, during his first admission for psychiatric treatment, he experienced side effects from the medications he was given. *Id.* ¶ 13. He noted that he was taken to the emergency room due to severe side effects on two occasions. *Id.* ¶ 14.

¶ 56        The trial court appeared to find Torry's testimony concerning his willingness to take medication to be more credible than the testimony of the doctor on that point. *Id.* ¶ 38. The court explained, however, that although Torry was willing to take medication, he needed to " 'get on some kind of treatment plan to take the medications.' " *Id.* The court therefore granted the petition for involuntary administration of psychotropic medication. *Id.* ¶ 21.

_____

[2]We note that at the hearing, Robert did call to the court's attention his willingness to seek treatment for anxiety. However, he did not explicitly make the argument that his willingness to take an antianxiety medication must be considered a less restrictive service. In the motion to reconsider and at the hearing on that motion, Robert only argued that the evidence was insufficient to prove that he exhibited suffering.

¶ 57    Torry appealed that ruling. In relevant part, he argued that his willingness to take medication voluntarily should be considered a less restrictive alternative to involuntary medication, and that the State failed to prove by clear and convincing evidence that this less restrictive alternative had been explored and found to be inappropriate. *Id.* ¶ 32.

¶ 58    The appellate court first considered "the legal question of whether a respondent's willingness to take medication voluntarily constitutes a 'less restrictive service[ ]' within the meaning of" the statute governing involuntary administration of psychotropic medication. *Id.* ¶ 33. In answering that question in the affirmative, the court emphasized that fact that, as we have already discussed, voluntary treatment has been held to be preferable to involuntary treatment in the context of proceedings for involuntary admission. See *id.* ¶¶ 34-35. The court found the same principle to be applicable in the case of proceedings for involuntary medication, explaining that "any treatment to which a mental health patient is willing to consent should be considered a 'less restrictive service[ ]' than forced treatment under section 2-107.1." *Id.* ¶ 35. The court therefore held that

> "when a patient is willing to take some forms of psychotropic medication, but not others, and the State seeks to forcibly administer medication in the latter category, the State must first prove by clear and convincing evidence that the drugs that the patient is willing to take 'have been explored and found inappropriate.' " *Id.* (quoting 405 ILCS 5/2-107.1(a-5)(4)(F) (West 2012)).

¶ 59    The court then went on to apply this holding to the circumstances before it. The treating psychiatrist in that case sought permission to administer two primary medications and seven alternate medications to Torry. *Id.* ¶ 4. There was evidence that Torry refused to take one of these nine medications, and there was evidence that he had previously experienced unpleasant side effects from taking one of the other medications. *Id.* ¶ 39. However, there was no evidence concerning Torry's willingness to take any of the other seven medications listed in the petition, and there was no evidence that any of the medications he "would have been willing to take were not appropriate as a substitute for the medications in the petition." *Id.*

¶ 60    Significantly for our purposes, the *Torry G.* court also considered the differences between the circumstances of *Torry G.* and the circumstances of *In re Israel*, 278 Ill. App. 3d 24 (1996), a case cited by the State in this case. In *Israel*, the question before the court was whether the trial court had jurisdiction to enter an order authorizing the involuntary administration of psychotropic medications to a respondent who was willing to take some psychotropic medications but refused to take other medications. *Id.* at 31. The respondent's treating psychiatrist testified that the respondent was voluntarily taking Valium to treat his anxiety. He testified, however, that the only medications that would treat the respondent's other symptoms—delusions and paranoia—were Haldol and Risperdal. *Id.* at 32. Because Valium, Haldol, and Risperdal "treat very different problems," the Second District concluded that "the State is not precluded from filing a petition seeking to administer another type of medication just because respondent consented to take one type of medication." *Id.*

¶ 61    The *Torry G.* court found *Israel* to be distinguishable from the facts before it because in *Torry G.*, unlike in *Israel*, "there was no testimony establishing that" the medications Torry was willing to take "could not effectively treat his mental illness." *Torry G.*, 2014 IL App (1st) 130709, ¶ 39. For this reason, the court concluded that the State failed to meet its burden of demonstrating that the less restrictive alternative of allowing Torry to take medications voluntarily had been explored and found to be inappropriate. *Id.*

¶ 62    We find the First District's reasoning in *Torry G.* persuasive. We agree that if a patient is willing to take some medications voluntarily, treatment with those medications is a less restrictive form of treatment that must be explored and found to be inappropriate before a court may authorize involuntary medication of the patient. It is important to emphasize, however, that the question is not simply whether voluntarily taking those medications is appropriate for the patient at all, but whether taking those medications in lieu of the medications requested in the petition is appropriate. See *id.* (pointing out the lack of evidence that any of the medications Torry was willing to take could be substituted for the medications he was not willing to take). It is in this respect that we believe the instant case stands in stark contrast to *Torry G.*

¶ 63    Here, there was evidence that, in addition to severe anxiety, Robert experienced anger, hostility, paranoid delusions, and somatic preoccupations that caused him to believe that a dental infection had spread throughout his body through his bloodstream. Like the psychiatrist in *Israel*, Dr. Patil testified that these symptoms could only be treated with antipsychotic medications. Thus, while an antianxiety medication like Klonopin was appropriate for Robert to treat his anxiety, the record in this case establishes that it was not appropriate to administer only an antianxiety medication without also administering antipsychotic medication to treat Robert's other symptoms. We therefore conclude that the evidence was sufficient to prove that less restrictive services were explored and found to be inappropriate.

¶ 64                                    III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the order of the trial court authorizing the involuntary administration of psychotropic medication to Robert M.

¶ 66    Affirmed.

- 13 -