NOTICE

Decision filed 12/21/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160126-U

NO. 5-16-0126

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | |
|---|---|
| *In re* CATHERINE M., Alleged to Be a Person Subject to Involuntary Administration of Psychotropic Medication | ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| (The People of the State of Illinois, Petitioner-Appellee, v. Catherine M., Respondent-Appellant). | ) ) ) ) ) ) | No. 16-MH-30 Honorable Donald M. Flack, Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the judgment of the circuit court granting the State's petition seeking the involuntary administration of psychotropic medication to a mental health patient where the collateral-consequences exception to the mootness doctrine applied to patient's appeal and the judgment was not supported by clear and convincing evidence that patient was suffering or had experienced a deterioration in her ability to function.

¶ 2    Catherine M., the respondent, appeals from the March 10, 2016, order of the circuit court of Madison County, finding her subject to the involuntary administration of psychotropic medications pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2-107.1 (West 2016)). Respondent argues that the trial court's finding that she met the statutory criteria for forced medication

1

was against the manifest weight of the evidence and that there was insufficient testimony that the benefits of the proposed treatment outweighed the risk of harm to the patient. She seeks the reversal of the circuit court's order. For the following reasons, we reverse.

¶ 3                                    I. Background

¶ 4     Respondent was 58 years old at the time of the proceedings in this matter. She had attained her bachelor's degree in nursing and had a valid nursing license in four states. Respondent had been living with her father prior to her admission. While the record does not contain the history of respondent's admission to Alton Mental Health Center (Alton), Dr. Ahmad, her treating psychiatrist while at Alton, testified that respondent was brought to the hospital on January 29, 2016 and admitted on "what they call a detention and evaluation order." Dr. Ahmad testified that respondent had previously failed to appear for a court-ordered outpatient evaluation for fitness to stand trial. Dr. Ahmad evaluated respondent, consulted with other professionals involved in her care, assessed her, and reviewed all available records. Dr. Ahmad diagnosed respondent as suffering over the past two years from a psychotic disorder, not otherwise specified, causing respondent to have delusions.

¶ 5     Respondent refused to voluntarily take psychotropic medication or participate in any other treatment offered at the hospital as she did not believe that she was suffering from a mental illness. On February 19, 2016, Dr. Ahmad filed an involuntary medication petition. Dr. Ahmad alleged that because of respondent's mental illness she was exhibiting deterioration in her ability to function, suffering, and threatening behavior. Dr. Ahmad sought authorization to administer seven primary medications (paliperidone, paliperidone

2

sustenna, haloperidol, haloperidol decanoate, benztropine, and lorazepam (orally and through intramuscular injection)) as well as six alternative medications (aripiprazole, aripiprazole maintaina, fluphenazine, fluphenazine decanoate, diphenhydramine, and hydroxyzine).

¶ 6       A hearing was held on March 10, 2016. Dr. Ahmad testified that respondent was experiencing delusions, in that she believed that she was born in the Netherlands and abducted as a child, only to be sold on the black market to her father. Dr. Ahmad testified that respondent was criminally charged with spitting on her father, whom she had lived with while unemployed. However, respondent believed there were no charges against her because they were dismissed. Respondent believed that she was abducted from her home by the police and brought to the hospital illegally, despite Dr. Ahmad attempting to explain and show her court documents showing that she was charged with a crime. Respondent had also sued numerous potential employers for illegally refusing her employment. Respondent had been unemployed for about a year and a half and was let go from her prior employment. She believed someone made a false allegation against her at her previous employment but did not know what the allegation may have been.

¶ 7       Regarding the criteria for involuntary medication, Dr. Ahmad testified that because of respondent's mental illness she was suffering and had experienced deterioration of her ability to function. Dr. Ahmad testified that respondent's mental illness was preventing her from being able to work. Dr. Ahmad further testified that her family relationships had been affected because she continued to accuse her father of not being her father. Dr. Ahmad testified that respondent was charged with a crime for spitting on her father's head, and

3

that she was not able to meaningfully participate in the criminal process as she believed the charges were dismissed when they were not. Respondent believed she was being victimized constantly by the hospital staff, judges, the police, her father, and employers. According to Dr. Ahmad, respondent paced back and forth and refused to participate in any treatment provided while at the hospital.

¶ 8     Dr. Ahmad stated that, after being admitted to Alton, respondent had not required emergency medication, restraints, or to be placed in seclusion. She had not been physically aggressive or threatening while in the hospital setting. Respondent was able to take care of her activities of daily living, such as sleeping, eating, and maintaining cleanliness, and was civilized to everyone during her hospital stay. She was in good physical health other than a finger that was injured when a door was shut on her. For that injury she refused an x-ray and oral antibiotics and refused to see a surgeon despite medical recommendations. There was pus present and the doctors were concerned about her finger, but at the time of the hearing it was mostly healed.

¶ 9     Dr. Ahmad testified about the proposed primary and alternative medications requested to be administered to respondent over her objection, their dosage, and their side effects. Dr. Ahmad did not specifically testify about the benefits of diphenhydramine and hydroxyzine, but he testified about their side effects and testified that they were alternatives to two side-effect-relieving medications. Dr. Ahmad testified that the benefits of the requested medications outweighed their risks, explaining that they would produce some improvement, even remission, of respondent's symptoms.

¶ 10    There were two antipsychotic medications listed in the "primary medications" section of the order, paliperidone and haloperidol. Dr. Ahmad did not testify about the risks or benefits of the combination of these two antipsychotic medications, but did testify that it was not his intention to administer those two drugs at the same time. When asked, "Are you going to administer both [haloperidol and paliperidone] at the same time?" the doctor answered, "No. One at a time. No. Just one at a time." He went on to explain that his preference was to administer the paliperidone, but that particular medication was not available in a short-acting injectable form, and if the patient was uncooperative he would have to choose haloperidol as it does have a short-acting injectable form.

¶ 11    Respondent testified that she was sleeping "OK," had no physical illness other than her hurt finger, and felt neither pain nor suffering, other than for her loss of employment. She explained that she had filed five lawsuits *pro se* to redress her employment issues but that they were all dismissed, and she needed a qualified attorney to help her get to the bottom of what had happened. She believed that people had made false allegations against her, in both her pending criminal and civil cases. Respondent testified that she had no desire to harm herself or others, that she was not placed in restraints or seclusion, and that she had not been given medication on an emergency basis during her 41-day stay at the hospital.

¶ 12    Respondent testified that she did not want to take the medications because she had no pending criminal charge. Respondent believed she was brought to the hospital after being abducted, the date of her criminal charge was incorrect and based on a false allegation, she did not fail to appear, and she was perfectly healthy and did not need to take an antipsychotic medication because she had never been psychotic.

¶ 13　The trial court found that there was clear and convincing evidence that due to respondent's mental illness, she was suffering and had exhibited a deterioration of her ability to function compared to her ability to function prior to the current onset of her symptoms. The trial court found that respondent had not been able to function on her own without assistance since the onset of her symptoms and had been unable to maintain employment. The trial court went on to find that the benefits of the treatment would outweigh any risk of harm. The trial court found that despite respondent's intellectual ability to understand the medications and potential side effects, respondent's psychosis was preventing her from having the capacity to make a reasoned decision about her treatment. Less restrictive services had been explored and found inappropriate in the absence of medication, and the diagnostic testing requested by the doctor was found to be essential for the safe and effective administration of the medication.

¶ 14　The circuit court entered a written order on March 10, 2016, allowing respondent to receive psychotropic medication over her objection for a period not to exceed 90 days. The respondent filed a notice of appeal on March 28, 2016.

¶ 15　　　　　　　　　　　　　II. Analysis

¶ 16　　　　　　　　　　　　　A. Mootness

¶ 17　We first acknowledge that this appeal is moot, as the March 10, 2016, 90-day involuntary medication order has expired. Our decision in this case will not grant respondent effective relief from the order allowing involuntary medication. *In re Joseph M.*, 398 Ill. App. 3d 1086, 1087 (2010). Generally, courts of review do not decide moot

6

questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided. *In re Barbara H*., 183 Ill. 2d 482, 491 (1998).

¶ 18    Respondent concedes that the issue is moot but argues her appeal falls within all three of the exceptions to the mootness doctrine. The three recognized exceptions to the mootness doctrine are (1) the public-interest exception, (2) the capable-of-repetition-yet-evading-review exception, and (3) the collateral-consequences exception. *In re Beverly B.*, 2017 IL App (2d) 160327, ¶ 19. The State agrees that the collateral-consequences exception applies to this appeal because the involuntary medication order could affect respondent's nursing license and, therefore, her future employment.

¶ 19    In determining whether a mootness exception applies, a court must conduct a case-by-case analysis and "consider all the applicable exceptions in light of the relevant facts and legal claims raised in the appeal." *In re Alfred H.H.*, 233 Ill. 2d 345, 364 (2009). While Illinois courts ordinarily lack jurisdiction to decide moot questions, most mental health cases fall within one or more of the recognized exceptions to the mootness doctrine. *Id.* at 351-55.

¶ 20    We agree with the parties that the collateral-consequences exception to the mootness doctrine applies here. This exception applies where the involuntary medication order at issue could cause harm to the respondent in the future and where such potential harm is likely to be redressed by a favorable judicial determination. *Id.* at 361. In *Alfred H.H.*, our supreme court held that the collateral-consequences exception can be applied in mental health cases. *Id*. at 361-62. The reversal of an order of involuntary administration of

7

medication over objection could affect the ability of a respondent to seek employment in certain fields. *Id*.

¶ 21 The record reveals that prior to her admission, respondent was let go from her employment as a nurse but continued to seek employment in that field before her involuntary admission for mental health treatment. Respondent testified that she wished to continue her employment search upon her release. Respondent had no prior involuntary-treatment orders and no criminal history other than the pending charge which alleged she spit on her father.

¶ 22 While respondent had no prior involuntary orders under the mental health code, this fact standing alone would not invoke the collateral-consequences exception to the mootness doctrine. However, respondent's license to practice as a nurse and her ability to gain future employment could be affected by an order for involuntary medication. Pursuant to section 70-5 of the Nurse Practice Act, "[t]he [Illinois] Department [of Financial and Professional Regulation] may refuse to issue or to renew, or may revoke, suspend, place on probation, reprimand, or take other disciplinary or non-disciplinary action as the Department may deem appropriate, including fines not to exceed $10,000 per violation, with regard to a license for any one or combination of the causes set forth in subsection (b) below." 225 ILCS 65/70-5(a)(30) (West 2016). Section 70-5(b)(30) of the Nurse Practice Act indicates that grounds for disciplinary action include: "[p]hysical illness, *** mental illness, or disability that results in the inability to practice the profession with reasonable judgment, skill, or safety." *Id*. § 70-5(b)(30). Respondent has pointed to specific concerns resulting from the order, including her ability to seek employment similar to that she has

held in the past. Therefore, based on a case-by-case analysis of the particular facts and circumstances of this case, the collateral-consequences exception applies here, and we will address the merits of respondent's substantive arguments.

¶ 23                                    B. Sufficiency of the Evidence

¶ 24   The respondent contends that the circuit court's order authorizing the involuntary administration of psychotropic medication must be reversed. She argues that she was denied due process by the State's failure to present clear and convincing evidence to support of the granting of the petition for involuntary treatment. On appeal, we review the circuit court's factual findings to determine whether they are against the manifest weight of the evidence. *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 24. However, we conduct a *de novo* review of the circuit court's rulings on questions of law. *In re Robert M.*, 2020 IL App (5th) 170015, ¶ 37.

¶ 25   The Illinois Supreme Court has held that the involuntary administration of psychotropic medication involves a massive curtailment of liberty. *In re Robert S.*, 213 Ill. 2d 30, 46 (2004). The Code serves, in part, to protect patients from the potential misuse of psychotropic medication by medical staff to restrain, manage, or discipline patients, rather than to treat their mental illness. *In re C.E.*, 161 Ill. 2d 200, 215-16 (1994). For these reasons, Illinois courts recognize that mental health patients have a constitutionally protected right to refuse psychotropic medications. *Id*. at 214-15.

¶ 26   However, the State also has a legitimate *parens patriae* interest in furthering the treatment of mentally ill patients who are incapable of making reasoned decisions regarding their treatment. *Id*. at 217. The procedures in the Code were enacted by our

9

legislature to ensure that Illinois citizens are not improperly subjected to involuntary mental health services. *Robert M.*, 2020 IL App (5th) 170015. Given the potential serious side effects of psychotropic medication, courts must be cautious in the entry of orders allowing hospital staff to involuntarily administer these drugs to persons suffering from mental illness. *In re David S.*, 386 Ill. App. 3d 878, 883-84 (2008). Section 2-107.1 of the Code delineates the nonemergency circumstances under which psychotropic medication may be administered against the wishes of the recipient. *In re Wendy T.*, 406 Ill. App. 3d 185, 191 (2010), *overruled on other grounds by In re Rita P.*, 2014 IL 115798. Under this section, psychotropic medication may be administered to one who is receiving mental health services, provided that the standards and procedures set out in the section are satisfied. *C.E.*, 161 Ill. 2d at 204. These guidelines are in place in order to provide the respondent with due process. *David S.*, 386 Ill. App. 3d at 881. Section 2-107.1(a-5)(4) of the Code directs that the forced administration of psychotropic medication is authorized only if the court finds evidence of each of the following elements, by clear and convincing proof:

> "(A) That the recipient has a serious mental illness or developmental disability.
>
> (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

10

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 2016).

¶ 27    In determining whether respondent meets these criteria, we may consider respondent's history of serious violence, repeated past pattern of specific behavior, actions related to her illness, and past outcomes of various treatment options. *Id.*

¶ 28                                    1. Suffering

¶ 29    Respondent first argues that the State failed to prove by clear and convincing evidence that, due to her mental illness, respondent displayed symptoms sufficient to warrant involuntary treatment because she was suffering. The term "suffering" is not defined in the Code and must therefore be afforded its plain and ordinary meaning. *Debra B.*, 2016 IL App (5th) 130573, ¶ 38. To prove that a respondent is suffering, the State must show that she is experiencing physical pain or emotional distress. *Id.* In *Debra B.*, this court described the type of evidence that would support a finding of suffering. We explained:

"Although we do not believe that evidence of physical manifestations of depression is necessary to meet the clear-and-convincing standard, we do believe that the State must provide some factual basis for an assertion that a respondent is suffering. For example, the medical expert might testify that the respondent has reported feeling sorrow, frustration, anger, anxiety, or some other intense negative emotion, or that the respondent has behaved in a manner that indicates she is experiencing some sort of emotional anguish." *Id*. ¶ 44.

¶ 30 Respondent relies on our holding in *Debra B.* to support her claim that the court's reliance on her symptomology was, in essence, a finding that she was subject to the involuntary administration of psychotropic medications based solely on the fact that she is mentally ill.

¶ 31 In *Debra B.*, the respondent's symptoms included racing thoughts, pressured speech, increased psychomotor activity, florid mania, and grandiose delusions. *Id*. ¶ 4. Debra's treating psychiatrist explained at her trial that " '[a]ll the symptoms that she exhibited is a suffering basically.' " *Id*. ¶ 7. He testified that Debra was incessantly writing, and he opined that her writings indicated suffering. *Id*. Dr. Patil described the contents of Debra's writings, none of which gave any obvious indication that Debra was angry, sad, or fearful. *Id*. ¶¶ 8-10. Debra testified that she was suffering based on her involuntary admission, because she missed her daughter, and because she worried about her mother and pets. *Id*. ¶ 8. The trial court found this evidence to be sufficient to prove that Debra was suffering by clear and convincing evidence. *Id*. ¶ 18. In reversing the ruling on appeal, this court considered the dictionary definitions for the word "suffering" and held that, "to

12

prove that a respondent is suffering, the State must show that she is experiencing physical pain or emotional distress." *Id*. ¶ 38.

¶ 32 We further addressed the type of evidence that would lead to a finding of suffering in *Robert M.*, 2020 IL App (5th) 170015. Robert suffered from delusions; he believed that his fever was "cooking his brain" and that his dental infection was spreading throughout his bloodstream. *Id*. ¶ 47. Further, he believed that members of the staff at Alton were conspiring against him. *Id*. The court noted, as we had previously in *Debra B.*, that paranoid delusions might "cause anyone to feel isolated and fearful." *Id*. Robert also refused pain medication based on his paranoia, which would have alleviated the suffering from his tooth pain. *Id*. Further, Robert behaved angrily and reported feeling severe anxiety. *Id*. ¶ 48. This court found the evidence the State presented to be precisely the type to support a finding of suffering, and found that it was sufficient to support the court's finding that Robert was suffering.

¶ 33 In determining that Robert met the criteria for suffering, this court considered two previous Illinois appellate decisions that addressed the question of suffering—*In re Wendy T.*, 406 Ill. App. 3d 185 (2010), *overruled on other grounds by In re Rita P.*, 2014 IL 115798, ¶¶ 33-34, and *In re Lisa P.*, 381 Ill. App. 3d 1087 (2008). *Robert M.*, 2020 IL App (5th) 170015, ¶ 44. In *Wendy T.*, the respondent often became angry because she was unable to communicate effectively or perform basic tasks. *Wendy T.*, 406 Ill. App. 3d at 188. The appellate court found that this evidence was sufficient to support the trial court's finding that respondent was suffering. In *Lisa P.*, the Second District found that the State proved suffering, along with a deterioration in ability to function, because of the

13

respondent's demeanor (the trial judge commented that he observed the respondent to be suffering) and belief system (she thought she was a victim, that the world was evil, and that her entire family was after her; she also experienced rage, an intense negative emotion). *Lisa P.*, 381 Ill. App. 3d at 1090.

¶ 34 In *Robert M.*, this court found two significant distinctions in both *Lisa P.* and *Wendy T. Robert M.*, 2020 IL App (5th) 170015, ¶ 45. Both cases included at least some evidence that the respondents were suffering beyond a mere recitation of their symptoms and that the symptoms experienced by both respondents led more readily to an inference that they were suffering than the symptoms did in *Debra B. Id.* We reasoned that if there is a clear nexus between the symptoms themselves and a respondent's suffering, the symptoms themselves may be enough to support a finding of suffering. *Id.*

¶ 35 In the present case, respondent was diagnosed with psychotic disorder, not otherwise specified. Dr. Ahmad testified that respondent's condition had persisted for at least two years. No emergency medication was needed during her hospitalization. Respondent was in good physical health, she was eating and sleeping adequately, she was adequately grooming, and she had not been aggressive and had in fact been "quite civilized to everyone." Respondent had not been placed in restraints or seclusion while at Alton.

¶ 36 Dr. Ahmad testified to respondent's symptomology, including paranoid delusions that she was kidnapped when she was a baby, taken to another country, raised by people that were not her parents, fired from her job based on false allegations, unable to gain employment based on false allegations, falsely charged with a crime, kidnapped by police, and falsely imprisoned in the mental health facility. As discussed in *Robert M.*, some

14

paranoid delusions are of such a nature as they would cause anyone to feel isolated and fearful. However, the delusions in *Robert M.* were that his fever was cooking his brain and his bloodstream was being poisoned by an infection. Robert had behaved angrily and reported experiencing severe anxiety. The State, in this matter, did not present any evidence to support a finding that respondent's delusions, while unpleasant, were of the type likely to cause any person extreme emotional anguish, nor that they were in fact causing respondent extreme emotional anguish. While respondent had been observed pacing in the hospital, she repeatedly denied suffering.

¶ 37    The facts of the present case are more akin to the facts described in *Debra B.*, where respondent's doctor testified that she was suffering based on her symptoms. In *Debra B.*, respondent's doctor described her symptoms by recitation: racing thoughts, pressured speech, increased psychomotor activity, florid mania, and grandiose delusions. *Debra B.*, 2016 IL App (5th) 130573, ¶ 4. While the respondent in *Debra B.* may have experienced suffering from those symptoms, more specific testimony relating to how the symptomology was causing the suffering or would lead to an inference of suffering was absent in that case. The doctor failed to describe how the patient's symptoms caused her to feel grief, anxiety, depression, or any other type of emotional distress. We concluded in that case that the evidence was insufficient to support a finding that the respondent was "suffering." *Id*. ¶ 45.

¶ 38    Likewise, here, respondent displayed paranoid delusions; however, the only testimony that she was suffering included that she was feeling victimized and that she was pacing while in the hospital setting. She was able to conduct herself well at the hearing and explicitly denied that she was suffering. There was no testimony that respondent exhibited

the physical manifestations of suffering, such as crying, lying in a fetal position, lashing out, or that she experienced feelings of hopelessness, guilt, or worthlessness that may legitimately be interpreted as suffering. While some symptoms may more readily be the basis for a finding of suffering, here the State did not present sufficient evidence to show a nexus between respondent's suffering and her symptoms to support a legally sufficient finding of suffering. For the foregoing reasons, we find that the trial court's conclusion that respondent was suffering was against the manifest weight of the evidence.

¶ 39                              2. Deterioration of Ability to Function

¶ 40    Respondent's next argument is that the State failed to prove by clear and convincing evidence that, due to her mental illness, she had experienced a deterioration in her ability to function. The trial court found that respondent had exhibited a deterioration in her ability to function, as compared to her ability to function prior to the current onset of her symptoms. In order to meet its burden to show deterioration in ability to function, the State must demonstrate that the patient's ability to function on a basic level had deteriorated. *Id.* ¶ 35. The State must show more than the fact that the respondent suffers from a mental illness. *Id.* ¶ 36. In *Debra B.*, we reversed the trial court's finding that Debra B. exhibited a deterioration in her ability to function, explaining that she was able to function reasonably well, at least in the environment of the facility, because of her ability to participate in therapy sessions and shower. *Id.* ¶ 52.

¶ 41    Additional cases that have considered the type of deterioration in ability to function that supports an order for the involuntary medication of a mentally ill patient include: *Wendy T.*, 406 Ill. App. 3d at 194 (upholding a trial court's finding of a deterioration in the

16

respondent's ability to function where there was evidence that she was unable to "carry on everyday conversations, accept and process what other people say, make decisions, or execute simple tasks"), *overruled on other grounds by Rita P.*, 2014 IL 115798, ¶¶ 33, 34; and *In re Perona*, 294 Ill. App. 3d 755, 766 (1998) (affirming the trial court's finding of a deterioration in ability to function where the evidence showed that the respondent was unwilling to keep his clothes on, that he was depressed, and that he was not eating regularly).

¶ 42    In *In re Bontrager*, 286 Ill. App. 3d 226 (1997), the testimony supported that respondent had become agitated and physically aggressive, and that she went from a college educated, employed, married woman, to one who is unemployed, moves from place to place, and will not comment on her marital status. *Id.* at 231. These were found to be characteristics that did not, standing alone, constitute clear and convincing evidence of respondent's deteriorating ability to function. *Id*.

¶ 43    Here we conclude that the evidence was insufficient to show a deterioration in respondent's ability to function. While respondent had been charged with a crime, and had become homeless and unemployed, she was doing well in the hospital setting. Respondent was eating properly and was not threatening staff or patients. She was pleasant in her interaction with other patients and staff. She was sleeping well, grooming well, and adequately addressing her activities of daily living. She had also not been subject to emergency medication or restraints while at Alton. For the foregoing reasons, we find that the trial court's conclusion that respondent was experiencing a deterioration of her ability to function based on her mental illness was not supported by the evidence. The State failed

17

to prove a required element of the Code, that respondent exhibited either (i) deterioration of her ability to function, as compared to respondent's ability to function prior to the current onset of symptoms of the mental illness for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.

¶ 44                    C. Benefits of Treatment Outweigh the Risk of Harm

¶ 45    Respondent's final argument is that the State failed to provide clear and convincing evidence that the benefits of the proposed treatment outweighed the risk of harm to respondent. Although respondent failed to raise this issue in the trial court, it affects a substantial right and, therefore, we review it for plain error. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *In re Cynthia S.*, 326 Ill. App. 3d 65, 68 (2001).

¶ 46    Given the invasive nature of psychotropic medications, and the possibility of significant side effects associated with the medications, courts must be cautious in entering orders allowing hospital staff to involuntarily administer these medications. *David S.*, 386 Ill. App. 3d at 882. The State may not administer psychotropic medication to a recipient of mental health care services unless it proves by clear and convincing evidence that, *inter alia*, the benefits of the enforced medication outweigh the harm that might stem from the medication, the recipient "lacks the capacity to make a reasoned decision about the treatment," other less restrictive treatment modalities have been explored and found not to be appropriate, and the proposed tests necessary to ensure that the treatment for which permission of the court is sought will be safe and effective. 405 ILCS 5/2-107.1(a-5)(4)(E)-(G) (West 2016).

¶ 47 A testifying expert must support his opinions with specific facts or testimony regarding the bases of those opinions. *In re Larry B.*, 394 Ill. App. 3d 470, 475 (2009). The statutory scheme of the Code requires specific evidence of the benefits and risks of each medication sufficient for the trial court to determine that the benefits of the proposed treatment outweigh the potential harm. *Id.* at 476.

¶ 48 Dr. Ahmad testified that the proposed medications' benefits outweighed their potential harm to respondent. He detailed the risks and benefits of the requested medications. Respondent argues that Dr. Ahmad failed to testify to the benefits of both diphenhydramine (commonly known as Benadryl), which was requested as an alternative medication for benztropine (commonly known as Cogentin), and hydroxyzine, which was requested as an alternative medication for lorazepam (commonly known as Ativan). Both of these medications are side-effect-relieving medications, not psychotropic medications. See *In re Suzette D.*, 388 Ill. App. 3d 978, 985 (2009).

¶ 49 Section 2-107.1 of the Code governs the administration of psychotropic medication. See 405 ILCS 5/2-107.1 (West 2016). The Code does not require that an involuntary treatment petition or an involuntary-treatment order set forth proposed nonpsychotropic medications. *Id.* However, the State is not prohibited from requesting such medication and the trial court is not prohibited from including the medication in the treatment order, provided that there is evidence to support it. *Id.* In *In re M.T.*, 371 Ill. App. 3d 318 (2007), we rejected the argument that the circuit court's order should be reversed because the side-effect-relieving medications were not requested in the petition or authorized by the court,

finding that there was no authority reversing a medication order because a side-effect-relieving medication was not listed in the court's order. *Id.* at 324.

¶ 50  Here, Dr. Ahmad detailed the benefits of the primary side-effect-relieving medications, Cogentin and Ativan. Dr. Ahmad testified that Cogentin would be used, as needed, for "side effects caused by antipsychotics like tremors, restlessness, akathisia, those kind of things ***." Ativan would be given as needed for relief of anxiety. As the alternative medications, it is clear from the testimony that the benefits of Benadryl and hydroxyzine would be used to substitute for and provide the same benefits as the medications for which they were proposed as an alternative.

¶ 51  Respondent did not object to the administration of the alternative side-effect-relieving medications at her hearing. Further, she does not allege in her petition that she was not aware of the potential benefits of the alternative side-effect-relieving medications. If the State's failure to include side-effect-relieving medication in its petition or order at all was not a basis for reversal, we cannot see how failing to explicitly recite the benefits of two alternate side-effect-relieving medications would be cause for reversal, especially where the benefits can be ascertained from the context of the testimony.

¶ 52  Respondent next argues that she will be treated with two antipsychotic medications and the State presented no evidence of the potential harm to respondent based on the interaction of these medications. The court order entered authorized two primary antipsychotic medications (paliperidone and haloperidol). While Dr. Ahmad did not testify about any increased risk based on the combination of the administration, at the same time, of the two antipsychotic medications ordered, Dr. Ahmad testified under oath that he would

20

only administer one antipsychotic medication at a time. His first-choice antipsychotic medication was paliperidone; however, paliperidone was not available in a short-acting injection. If the respondent refused oral medication, Dr. Ahmad testified that he would have to begin treating respondent with haloperidol, as it did come in a short-acting injectable form. While haloperidol should have been more accurately listed in paragraph B of the order relating to alternative medications, the testimony of Dr. Ahmad made clear that haloperidol was an alternative medication for paliperidone in respondent's medication protocol. Section 2-107.1 of the Code vests the physician authorized to administer the involuntary treatment "complete discretion" not to administer the treatment. 405 ILCS 5/2-107.1(a-5)(6) (West 2016). Dr. Ahmad demonstrated through his testimony that he was well versed in respondent's treatment plan. Dr. Ahmad made clear that the second requested antipsychotic medication was requested as an alternative to the primary antipsychotic, which would only be administered if respondent refused to take the oral form of his primary choice. As such, the evidence deduced from the order, and the transcript from the March 10, 2016, hearing, are sufficient to have appropriately informed the court that there was not a risk of drug interaction between the two antipsychotic medications. Based on the above, the trial court had sufficient evidence upon which to determine that the benefits of the treatment protocol outweighed the risk of harm to the patient.

¶ 53                                    III. Conclusion

¶ 54    Based on the foregoing, the involuntary-treatment order entered by the circuit court was not supported by evidence that the respondent was exhibiting suffering or a deterioration in her ability to function, sufficient to justify an order for involuntary

21

medication. Accordingly, we reverse the judgment of the circuit court granting the State's petition for the involuntary administration of medication. A remand is not necessary since the administration of the medication has been terminated according to the terms of the circuit court's order. See *In re Richard C.*, 329 Ill. App. 3d 1090, 1094 (2002).

¶ 55    The judgment of the circuit court of Madison County is reversed.


¶ 56    Reversed.